**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. ___1:24-cv-2439___

JOSEPH and SERENA WAILES;
D.W., B.W., and G.W., minors, by and
through their parents, Joseph and Serena
Wailes, as the minors' next friend;
BRET and SUSANNE ROLLER;
D.R. and B.R., minors, by and through
their parents, Bret and Susanne Roller, as
the minors' next friend;
ROBERT and JADE PERLMAN; and
M.P. and P.P., minors, by and through
their parents, Robert and Jade Perlman, as
the minors' next friend,

   Plaintiffs,

v.

JEFFERSON COUNTY PUBLIC
SCHOOLS; and
JEFFERSON COUNTY PUBLIC
SCHOOLS' BOARD OF EDUCATION,

   Defendants.

---

**VERIFIED COMPLAINT**

---

**<u>INTRODUCTION</u>**

1. Millions of children go on overnight trips through their schools each year. It's a rite of passage for students—a taste of independence while still being protected by adults like teachers and chaperones.

2. Although parents place trust in public schools every day when they drop off their children, parents who send their children on a school-sponsored

1

overnight trip must place special trust in the school and its employees to protect their children. Jefferson County Public Schools ("JeffCo"[1]) failed its mandate.

3.      For school trips, JeffCo tells parents that "girls will be roomed together on one floor and boys will be roomed together on a different floor." But what JeffCo fails to mention is that they have redefined the words "girl" and "boy" to mean a student's asserted gender identity rather than sex.

4.      When Joe and Serena Wailes allowed their eleven-year-old daughter to attend the JeffCo-sponsored Philadelphia and Washington, D.C. trip, they were told their daughter would be rooming with three other fifth-grade girls. It wasn't until their daughter, D.W., was in her room getting ready for bed on the first night of the trip that she found out she was to share a bed with a boy who identified as a girl.

5.      Unfortunately, this was not an isolated or unauthorized incident. JeffCo employees were simply following the District's explicit Policy. When Bret and Susanne Roller sent their 11-year-old son, B.R., on JeffCo's annual sixth-grade camping trip called Outdoor Lab, which is built into the sixth-grade science program, they were also told their son would be in a cabin with six to thirty other boys. They were told the camp counselors would include three male high school counselors and one male college counselor.

6.      It wasn't until B.R. was in the mountains, away from home for the first time, and with no form of communication, that he realized JeffCo had lied. One of his high school counselors—one that had been "female-identifying" the week before—was not male but was a "male-identifying" girl. B.R. soon found out that this girl was not just sleeping and changing in the same cabin but was also tasked by JeffCo to supervise the boys' *showers*, including his.

7.      After hearing of D.W. and B.R.'s experiences, Rob and Jade Perlman became concerned about their own children. Their son—P.P.—is supposed to attend

---

[1] Jefferson County Public Schools is called "JeffCo" locally.

Outdoor Lab in the coming months. Their daughter—M.P.— excels at athletics and plays basketball for JeffCo teams. The Perlmans are concerned about where their daughter will sleep while on JeffCo athletic trips. But they don't want their children to miss out on academic and extracurricular activities, especially those that provide educational benefit and could help them secure college scholarships, simply because JeffCo cannot assure their children's privacy on school-sponsored trips.

8.    Parents' fundamental right to make decisions about the upbringing and education of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation omitted). This fundamental right reaches its peak on matters of great importance such as parents' right to protect their children from violations of bodily privacy, which result when they must expose their bodies to the opposite sex in intimate settings, like overnight accommodations or shower facilities.

9.    JeffCo violated parents' fundamental rights by refusing to give them truthful, pertinent information about their children's overnight accommodations, thus frustrating their ability to make informed decisions about their children's education and related matters. This constitutional violation also threatens the children's right to bodily privacy, which is implicit in the concept of ordered liberty.

10.    Plaintiffs have made multiple requests for reasonable accommodations from JeffCo Policy JB R-2, attached hereto as Exhibit A, which rooms children by gender identity rather than sex. Plaintiffs were repeatedly denied. Now, the Plaintiffs respectfully ask this Court to grant them the relief requested in this Complaint and make clear that JeffCo can't violate the rights of parents or students.

## PARTIES

11.    Plaintiffs Joe and Serena Wailes are the married biological parents of three children.

12. D.W. is in seventh grade, and twins B.W. and G.W. are in fifth grade for the 2024–2025 school year.

13. The Waileses and their children are Jefferson County, Colorado residents.

14. D.W. was enrolled in district-operated schools from kindergarten until she graduated from fifth grade in May 2023.

15. D.W. currently attends a private middle school.

16. D.W. will attend a district-operated high school beginning in 2026.

17. The Waileses currently have two children, twins B.W. and G.W., who attend a district-operated elementary school.

18. The Waileses' twins will attend a JeffCo elementary school through fifth grade in the 2024-2025 school year, attend a private middle school, and then return to a district-operated school for high school in 2028.

19. Plaintiffs Bret and Susanne Roller are the married biological parents of three children.

20. Their oldest daughter, B.R., graduated from a JeffCo high school in May 2024.

21. The Rollers' middle daughter, D.R., currently attends a JeffCo high school.

22. The Rollers' youngest son, B.R., currently attends a JeffCo middle school.

23. The Rollers and their children are Jefferson County, Colorado residents.

24. The Rollers' daughter D.R. and their son B.R. will attend district-operated schools through high school, graduating in 2027 and 2029 respectively.

25. Plaintiffs Robert and Jade Perlman are the married biological parents of two children.

4

26.     Their oldest daughter, M.P., is a freshman at a JeffCo high school.

27.     Their younger son, P.P., currently attends a JeffCo middle school.

28.     The Perlmans and their children are Jefferson County, Colorado residents.

29.     The Perlmans' two children will attend district-operated schools through high school, graduating in 2028 and 2031.

30.     Defendant Jefferson County Public Schools (also called Jeffco Public Schools, the District, or JeffCo) is "a body corporate," CO Code § 22-32-101 (2022), and can thus sue or be sued.

31.     The District is "governed by a board of education." CO Code § 22-32-103 (2022).

32.     Defendant Jefferson County Board of Education ("the Board") governs the District.

33.     The District and the Board are political subdivisions of the State of Colorado.

## JURISDICTION AND VENUE

34.     This civil rights action raises federal questions under the First and Fourteenth Amendments to the United States Constitution and the Civil Rights Act of 1871, 42 U.S.C. § 1983.

35.     This Court has original jurisdiction under 28 U.S.C. §§ 1331 and 1343.

36.     This Court has authority to award the requested declaratory relief under 28 U.S.C. §§ 2201–02 and Fed. R. Civ. P. 57; the requested injunctive relief under 28 U.S.C. § 1343 and Fed. R. Civ. P. 65; damages under 28 U.S.C. § 1343; and the requested costs and attorney fees under 42 U.S.C. § 1988 and Fed. R. Civ. P. 54.

37.     Venue is proper in this District Court and Division under 28 U.S.C. §§ 1391(b)(1), (c)(2) because all the events and omissions giving rise to the claims occurred in this District.

38. Those same facts grant this Court personal jurisdiction over the District.

## FACTUAL BACKGROUND

### I. The Waileses

### A. Planning for JeffCo's June 2023 Philadelphia/Washington D.C. Trip

39. Joe and Serena Wailes have three children,

40. D.W. is in seventh grade for the 2024–2025 school year.

41. Boy/girl twins, G.W. and B.W., are in fifth grade for the 2024–2025 school year.

42. D.W. attended elementary school in JeffCo, and the twins currently attend elementary school in JeffCo.

43. D.W. attends a private middle school and will return to a JeffCo high school in 2026.

44. Around November 2021, Mr. and Mrs. Wailes were informed by D.W.'s JeffCo elementary school Principal that a fifth-grade JeffCo-sponsored trip to Philadelphia and Washington, D.C. would be held in June 2023.

45. The trip was only advertised to JeffCo students and only open to JeffCo students.

46. The trip was led by D.W.'s Principal and chaperoned by JeffCo teachers and administrators.

47. While JeffCo sponsored the trip, it contracted with EF Tours, a private company, to create the itinerary and help coordinate it.

48. During the approximately eighteen months before the trip, Mrs. Wailes attended two parents' meetings, lasting around one to two hours each.

49. One meeting was in approximately November 2021 at their elementary school, and one meeting was in June 2023 at the JeffCo School Building.

50. The Waileses also received over 30 pages of trip-related documents to review and sign, attached hereto as Exhibit B.

51.    JeffCo Policy JJH-E2 is the "Student Responsibility Sign-Off" form, which lists the responsibilities of students participating in the "Districtwide Philadelphia/DC Trip" through EF Tours.

52.    The other forms included an Allergy and Medical Profile form and the Parent-Guardian Emergency Form.

53.    The Waileses signed D.W. up for the trip in November 2021 and began making payments toward the trip cost.

54.    The Waileses paid $2,017 for D.W. to attend the trip.

55.    Although the Waileses wanted D.W. to experience the benefits of the trip, they felt that D.W. was too young to travel so far without a parent. So Mrs. Wailes accompanied D.W., but she was not a chaperone.

56.    Mrs. Wailes paid $2,849 to attend the trip and roomed with another mom.

57.    The Waileses paid for D.W. to attend the trip, and D.W. raised her spending money by selling lemonade.

58.    At each parent meeting, D.W.'s principal, who was leading the trip, informed Mrs. Wailes that girls would be roomed on one hotel floor and boys on another.

59.    When the Principal told the Waileses that girls and boys would be roomed separately, they understood this to mean that rooms would be assigned based on biological sex.

60.    The Principal did not reveal that rooms would be assigned based on gender identity because of JeffCo's Transgender Students Policy.

61.    Despite the many policies and paperwork provided before the trip, the Waileses were never given a copy of the JeffCo Transgender Students Policy, which discusses rooming on school-sponsored trips, or informed that such a policy exists.

7

62. The Transgender Students Policy states that children will be assigned to overnight accommodations based on gender identity rather than sex. As a result, a male student who identifies as a girl will be placed in a room and bed with girls.

63. Ahead of the trip, JeffCo assigned the students to rooms with three other students.

64. JeffCo requested that each student attending the trip write down his or her three requested roommates.

65. D.W. was not assigned all three roommates she requested.

66. Of the other three students assigned as her roommates, D.W. knew two who attended her same school and did not know the other student who attended a different JeffCo elementary school.

67. D.W. met this third roommate for the first time at the June 2023 parents meeting at the JeffCo School Building.

68. JeffCo arranged for each group of four students to stay in a room with two queen beds, meaning each student was required to share a bed with another student.

69. D.W. and the student she did not know were supposed to share a bed.

70. This trip was a rite of passage for D.W., and she looked forward to it for eighteen months.

**B. JeffCo's June 2023 Philadelphia/Washington D.C. Trip**

71. After eighteen months of anticipation, the trip finally occurred from June 25–30, 2023.

72. Mrs. Wailes and D.W. arrived at the airport at around 4:45 a.m. to fly with the JeffCo group to Philadelphia at 7 a.m.

73. Once they arrived in Philadelphia, they immediately began sightseeing.

74. On the first day of the trip, the group toured Valley Forge.

75.    D.W. enjoyed sitting with the other three students assigned to her room at lunch and walking around together.

76.    Because she wanted the student from a different school to feel included, D.W. decided to go out of her way to include this student on the first day of the trip since the other three girls in the room knew each other.

77.    By the evening of the first day, when the tour group reached the hotel, everyone was exhausted.

78.    The JeffCo chaperones met to review the rules with the students.

79.    The JeffCo chaperones told students that boys were not allowed to visit the girls' floor and vice versa without permission.

80.    The JeffCo chaperones did not inform parents or students on the trip that they were dividing boys' and girls' floors based on something other than biological sex.

81.    After dinner, D.W. and her three roommates were in their room getting ready for bed.

82.    One of D.W.'s roommates was feeling sick, so she was lying on the sofa to separate from the other three students.

83.    D.W. and the other two roommates sat on one of the queen beds, sharing the screensaver pictures on their phones.

84.    Mr. and Mrs. Wailes had given D.W. a phone to use for the week since she did not have one, so D.W. showed the stock background on her phone.

85.    The student from the other school showed D.W. the background on the student's phone, a Pride flag, and shared that the student was born a boy and identifies as transgender.

86.    D.W. was shocked.

87.    It quickly dawned on her that she was about to share a bed with a boy.

9

88. Although D.W. enjoyed sightseeing with this student, D.W. objects to sharing private spaces like a room, bathroom, and bed with a male, regardless of that student's gender identity.

89. D.W. also objects to completing intimate activities—such as undressing, showering, using the restroom, and sleeping—in the presence of a male.

90. D.W. is not comfortable sharing these private spaces with any non-family members of the opposite sex.

91. D.W. snuck into the bathroom, which did not lock and only had a frosted glass door, and quietly called her mom to tell her what was happening.

92. D.W. called Mrs. Wailes, and with a quiver in her hushed voice, D.W. told her mom that her bedmate was a boy.

93. Mrs. Wailes's first thought was that D.W. must have misunderstood. After all, D.W. was only eleven, and Mrs. Wailes could not fathom that her school district assigned her daughter to sleep with a boy.

94. D.W. was acutely aware that her roommates were on the other side of a thin glass door and did not want to be overheard. Mrs. Wailes told D.W. to come to the lobby to talk privately.

95. D.W. then met her mother in the lobby and relayed what her roommate had told her.

96. Mrs. Wailes informed a JeffCo teacher who was on the trip as a chaperone.

97. After the teacher heard what happened, she informed D.W.'s Principal.

98. Around this same time, D.W. called her dad. She told him something had happened, but she didn't want to say it out loud and would text him.

99. D.W. then sent her dad a text informing him what happened with the other student in her bed.

10

100.    Mr. Wailes was shocked. He could not fathom that the district had put his little girl in this position, especially without informing him.

101.    But Mr. Wailes was two time zones away. Although his first instinct was to get his daughter home, he relied on Mrs. Wailes to figure out what was happening first.

102.    Mr. and Mrs. Wailes spoke on the phone. During that call, Mrs. Wailes reassured Mr. Wailes that there must be a mistake. The school could not have intended to assign a girl and a boy to the same room, especially knowing they would need to share a bed, without informing the student or her parents.

103.    Mrs. Wailes told her husband she would figure out what was happening and call him back.

104.    D.W.'s Principal then confirmed that D.W.'s roommate was a boy who identified as a girl and was intentionally assigned to the female floor.

105.    Before the trip, no one at JeffCo informed the Waileses or D.W. that she would be rooming with a male who identifies as transgender.

106.    JeffCo told them the opposite: that male and female students would stay on separate floors.

107.    Throughout this evening, Mrs. Wailes watched as her eleven-year-old daughter—who was put in a terrible position by the district—tried to explain that she liked this male student but did not feel comfortable rooming with this student.

108.    The JeffCo chaperones seemed unsure of how to handle the situation. They first asked D.W. if they could keep her in the same room but move her to a different bed.

109.    While D.W. was still uncomfortable with this arrangement, she was put on the spot. She agreed to try it for one night because she was exhausted after a sixteen-hour day of travel and sightseeing.

11

110.    JeffCo chaperones, following JeffCo's Transgender Students Policy, decided to lie to D.W.'s roommates and instructed D.W. to do the same, saying D.W. needed to switch beds to be closer to the air conditioner.

111.    But once the chaperone and D.W. were back in the room with the other three students, D.W. was again placed into a difficult position when another girl offered to let the male student also switch to the bed near the air conditioner so that student could remain in the bed with D.W.

112.    D.W. felt the panic begin to rise inside her. Mrs. Wailes had been trying to let D.W. advocate for herself, but at that moment, D.W. went into the hall where Mrs. Wailes was waiting and made eye contact with a look of desperation.

113.    D.W. was scared to speak up in front of the other students on such a contentious subject. She was scared to say anything in front of her peers.

114.    Additionally, D.W. did not want to hurt the male student's feelings or make this student feel as uncomfortable as she did.

115.    Instead, D.W. went into the hall with her mom and expressed that she just did not feel comfortable sleeping, showering, and changing in the same room with a male.

116.    Mrs. Wailes knew it was time for her to step in. She returned to the school chaperone and *again* asked for D.W. to be moved to a different room.

117.    This time, the chaperones agreed to move the male student and another girl to a different room but again lied about why, saying that D.W.'s sick roommate needed more space.

118.    Throughout the evening, JeffCo employees always prioritized the male student's privacy and feelings over D.W.'s.

119.    After the trip, the Waileses began searching online for a policy that governed how children were roomed on JeffCo-sponsored trips, but they found no such policy.

120.    Over the Summer of 2023, they talked to several other families in their community about the events that occurred on the school trip, and other parents were just as shocked as the Waileses had been.

121.    The Waileses eventually learned of a Policy called "Transgender Students," which mandated that all JeffCo students be roomed by gender identity rather than sex.

122.    The Waileses realized that this Policy mandated what happened with their daughter and meant it could happen again to D.W. or to her younger siblings if any of the kids went on JeffCo-sponsored overnight trips in the future.

123.    This concerned the Waileses because they did not want any of their three children to share a room or a bed with a student of the opposite sex, and their twins, B.W. and G.W., were already planning to go on the same Philadelphia/D.C. trip in the summer of 2025.

## II.    The Rollers

### A.  Planning for JeffCo's Winter 2022 Outdoor Lab

124.    Bret and Susanne Roller live in Conifer, Colorado.

125.    They own and run a family ranch.

126.    They have three children who have all attended JeffCo schools.

127.    The Rollers' two younger children are enrolled in JeffCo schools for the 2024-2025 school year, and their oldest daughter graduated from a JeffCo high school in 2024.

128.    Their youngest child, B.R., was in sixth grade at a JeffCo middle school in the 2022–2023 school year.

129.    All sixth graders in JeffCo schools participate in Outdoor Lab, which is part of that year's science curriculum.

130.    The "Information for parents of 6th grade students" sheet states: "All 6th grade students enrolled in Jeffco Public Schools are expected to attend Outdoor Lab

with their homeschool peers and teachers. The week onsite is immersed in 6th grade curriculum that cannot be replicated in the classroom." This letter was part of the materials shared with parents prior to Outdoor Lab, which are attached hereto as Exhibit C.

131. The program consists of sixth graders staying at a JeffCo-owned and operated campground in the mountains for four days and three nights.

132. No parents may attend or chaperone Outdoor Lab.

133. JeffCo does not allow parents to visit during Outdoor Lab.

134. Students at Outdoor Lab do not have any phone privileges to call their parents.

135. There are two Outdoor Lab campuses, Windy Peak and Mt. Blue Sky, each with a JeffCo-employed principal and permanent staff.

136. Each campus hires recently graduated JeffCo students as "interns," who stay there for a semester or a year and assist with the program as groups of sixth graders cycle through.

137. Students stay in cabins, which house between six and thirty students.

138. JeffCo high school students, typically in junior and senior year, are offered a chance to receive extra credit by participating in Outdoor Lab as a high school counselor.

139. Becoming an Outdoor Lab counselor is not required and is an extra-curricular program for high school students.

140. The counselors stay in the cabins with the sixth graders to chaperone and ensure they follow the rules.

141. When high school students are applying to be counselors, the application form reads, "According to Board Policy, JB-R[2], in most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school." The

14

form then allows the student to choose whether they stay in the "Male Bunk House" or "Female Bunk House." After other parents recently raised concerns with JeffCo after seeing this language, JeffCo then changed the form to remove the reference to the Policy but did not change the Policy itself.

142.    JeffCo instructs counselors to oversee the sixth graders whenever they are in the cabins, including when they sleep, change their clothes, and shower.

143.    In Outdoor Lab campuses, there are communal bathrooms where students shower. The Junior or Senior high school counselor stands outside the shower, separated by a thin curtain that doesn't fully reach the floor or the walls, and times each student's shower to ensure they abide by the cabin shower time limits.

144.    In the 2022–2023 school year, the Rollers' son—B.R.—attended Outdoor Lab.

145.    This is a longstanding program in JeffCo that students look forward to for years.

146.    B.R.'s older sister attended Outdoor Lab and enjoyed her experience.

147.    Before B.R. attended Outdoor Lab, the Rollers received an informational packet and attended informational meetings at B.R.'s middle school.

148.    Despite JeffCo informing high school students applying to be counselors that their Policy rooms students by gender identity rather than sex, this same language is not provided to parents when they are completing the paperwork for their sixth grader to attend Outdoor Lab.

149.    The Rollers were told that sixth graders would be staying in sex-separated cabins.

150.    Students could not choose their roommates.

151.    JeffCo will not inform parents before Outdoor Lab who their children's high school counselor will be or who the interns are.

15

152. The Rollers were told that B.R. would stay in a cabin with other sixth-grade boys.

153. They were also informed that students cannot have contact with parents during Outdoor Lab.

154. Students cannot bring cell phones, Apple Watches, iPads, walkie-talkies, or any other electronic devices to Outdoor Lab.

155. While at Outdoor Lab, students can only contact parents for severe illness or injury.

156. Outdoor Lab campuses have no phone for students to use to call parents.

157. Parents can drop off written letters to their children before the trip, which are distributed at the campground. This is the only permitted communication.

### B. JeffCo's Winter 2022 Outdoor Lab Trip

158. B.R. attended Outdoor Lab December 13–16, 2022.

159. Mr. and Mrs. Roller did not speak with B.R. during his four days at Outdoor Lab.

160. When Mrs. Roller went to pick B.R. up at the middle school at the end of the week, the first thing he told her was, "I had a girl in my cabin."

161. Mrs. Roller was taken aback and asked B.R. to explain.

162. B.R. said the high school counselor assigned to his cabin by JeffCo, who slept, changed, and showered in his cabin, was an eighteen-year-old female student.

163. The Roller family knew this eighteen-year-old female through the 4H Club they participated in together.

164. This eighteen-year-old female was a Jefferson County high school senior.

165. This eighteen-year-old female identified as a female at 4H only days before Outdoor Lab and continued to identify as a female at 4H after Outdoor Lab.

16

166. And at the JeffCo high school, the eighteen-year-old female identified as "nonbinary."

167. But because of JeffCo's Transgender Students Policy, she was placed by JeffCo as a "male-identifying" counselor in the all-boys cabin.

168. B.R. was very uncomfortable, as were the other boys in the cabin.

169. Many boys changed while lying down inside their sleeping bags to avoid changing in front of a female student who was seven years older than they were.

170. B.R. also told his mom that the eighteen-year-old female counselor assigned to his cabin was told to supervise the sixth graders' showers to limit hot water usage.

171. The cabin showers at Outdoor Lab have stalls with no door and only a thin fabric curtain to provide limited privacy.

172. The eighteen-year-old female counselor was instructed by JeffCo to stand outside the shower stalls as the eleven- and twelve-year-old boys entered and exited the shower stalls to ensure they didn't stay in the shower too long.

173. While at Outdoor Lab, B.R. and the other boys in his cabin discussed how uncomfortable they were rooming with a female.

174. B.R. and many other boys also discussed how uncomfortable they were showering in front of a female. In fact, B.R. and many other boys in his cabin decided together to refuse to shower during their entire stay at Outdoor Lab because they were too embarrassed and scared to shower in front of a female.

175. Mrs. Roller was shocked that the school assigned an eighteen-year-old female, especially one who had identified as a girl only days prior, to sleep next to her eleven-year-old son and supervise his showers, particularly without informing her. After the trip, the Rollers began looking for JeffCo's rooming policy that governed how children were roomed on JeffCo-sponsored trips and talking to others in the community about their son's experience.

17

176. The Rollers eventually learned of the Transgender Students Policy mandating that all JeffCo students be roomed by gender identity rather than sex.

177. The Rollers realized that this Policy allowed an eighteen-year-old female, who often changed her gender identity from female to nonbinary, to room with their eleven-year-old son and meant it could happen again to their son or his older sister if they went on JeffCo-sponsored overnight trips in the future.

178. This concerned the Rollers because they did not want any of their children to share a room or a bed with a student of the opposite sex but didn't want their kids to miss out on educational and extracurricular opportunities.

179. Both D.R. and B.R. participate in sports and clubs that involve both, in the current school year and the future.

### III.    The Perlmans

180. Robert and Jade Perlman live in Golden, Colorado.

181. Their children, M.P. and P.P., have attended JeffCo schools since kindergarten and pre-kindergarten respectively.

182. Over the last year, the Perlmans began hearing about JeffCo assigning other students to share rooms and beds with students of the opposite sex.

183. This trend deeply concerns the Perlmans because their children do, and will continue to, go on overnight trips with their JeffCo schools.

184. The Perlmans recognize the value of school-sponsored trips for children. These trips promote independence, maturity, and growth that cannot be replicated in a classroom.

185. Additionally, the Perlmans want their children to participate in extracurricular activities and sports where they can learn the value of teamwork and discipline.

18

186. For example, over this past summer as M.P. has been looking forward to high school athletics, the Perlmans have seen her commitment to training and discipline grow.

187. The Perlmans cannot move their children out of the JeffCo District.

188. Instead, they have become very involved parents, attending every parent meeting and asking questions to ensure they are comfortable with their children's accommodations on overnight trips.

189. The D.C. trip leader assured Mrs. Perlman that they would be, which was inaccurate as D.W.'s experience reveals.

190. Recently, the Perlmans found the JeffCo Policy that dictates children be roomed by gender identity instead of sex.

191. This Policy is particularly concerning to the Perlmans because they do not want either of their children to room overnight with a student of the opposite sex. Both of their children, P.P. and M.P, are scheduled to participate in JeffCo-sponsored activities that require overnight stays away from home.

192. The Perlmans' son P.P. is in sixth grade and has been looking forward to attending Outdoor Lab with his friends and teachers this year.

193. P.P.'s school will be attending Outdoor Lab in November 2024. The first meeting for parents will be September 12, 2024.

194. The Perlmans' daughter excels at athletics and will play soccer, softball, and basketball for her JeffCo high school. These teams often travel for tournaments that require overnight stays.

195. The Perlmans are particularly concerned about their daughter because of what M.P. has already endured at a JeffCo school. In the Spring 2023 semester, M.P. was sexually harassed by an eighth-grade boy at her JeffCo middle school.

196. After enduring months of harassment, she poked the boy with a pencil. The boy was wearing a thick sweatshirt when she poked him.

19

197.    Despite the harassment that district employees knew about and failed to stop, M.P. was detained and had a juvenile case filed against her for poking the boy with a pencil. To the Perlmans' knowledge, M.P.'s harasser did not receive any punishment.

198.    After what M.P. went through with the previous sexual harassment, the Perlmans will not take the risk of JeffCo placing their daughter in a room or bed with a boy.

199.    The same is true for P.P. The Perlmans want P.P. to get the educational benefits of Outdoor Lab, and P.P. would like to attend Outdoor Lab. But unless the District reassures him and his parents that he will not be roomed with a student, counselor, or intern of the opposite sex, the Perlmans are scared to send him on this trip. Without further guidance, the Perlmans cannot send their children on these trips.

200.    To date, JeffCo has made clear that it will not accommodate any non-transgender student in the District who is uncomfortable rooming with a student of the opposite sex or give any assurances to parents that their children will only be roomed with children of the same sex.

**IV.    The District's "Transgender Students" Policy**

201.    What happened to D.W. and B.R. was not a mistake. It was not an accidental mix-up in room assignments. Instead, the district's Policy played out as District officials intended.

202.    District Policy JB R-2 is titled "Equal Education Opportunities – Transgender    Students."    *See*    JEFFCO,    JB    R-2    (2013), https://go.boarddocs.com/co/jeffco/Board.nsf/goto?open&id=D6ZTBW76A356. Ex. A.

203.    The Transgender Students Policy's "guidelines set out [a] protocol for schools and district staff to address the needs of students who are transgender and gender nonconforming and clarify how state law should be implemented in

situation[s] where questions may arise about how to protect the legal rights and safety of such students."

204. The District states that the "guidelines should be interpreted consistent with the goals of reducing the stigmatization of and improving the education integration of transgender and gender nonconforming students, maintaining the privacy of all students, and fostering cultural competence and professional development for school staff."

205. The District mandates that "[s]chool staff shall not disclose information that may reveal a student's transgender status to others, including parents and other school staff, unless legally required to do so or unless the student has authorized such disclosure."

206. The District allows students to identify with a new gender and use preferred names and pronouns at school. Still, it requires the school to "maintain a mandatory permanent student record that includes a student's legal name and legal gender."

207. The Transgender Students Policy includes an "Overnight Activity and Athletic Trips" section that dictates where and how all students are roomed.

208. The District's Policy states that "[i]n most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school."

209. The Policy states that "[u]nder no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own."

210. The Policy previously stated that any student "who has a need or desire for increased privacy" "should be provided a reasonable accommodation, which may include a private room." This sentence was removed when the Policy was revised in July 2024.

## V.    Implementation of the Transgender Students Policy

211.    As implemented, the Transgender Students Policy means that any student can sign up for any JeffCo trip, whether the D.C. trip, Outdoor Lab, or athletic trips, and choose whether they room with girls or boys according to how they self-identify.

212.    Despite the Policy stating that a permanent record with the student's "legal gender" will be maintained, JeffCo allows students to choose whether they room with boys or girls without checking the student's legal sex.

213.    The Policy states that students can room with "other students that share the student's gender identity consistently asserted at school." This means a male student can identify as a girl and unilaterally choose to room with girls on a JeffCo trip.

214.    In practice, JeffCo does not require students to "consistently assert[]" a gender identity. JeffCo allows students who continually change their gender to choose whether to room with girls or boys for each trip.

215.    For example, the eighteen-year-old female counselor who slept in B.R.'s male cabin identified as a girl only a week before the Outdoor Lab trip.

216.    Nor does JeffCo inform the other students that they will be sharing a room, cabin, or bed with a student of the opposite sex.

217.    Because there are district-wide trips, students from different schools who do not know each other can be placed in rooms together. So they may not immediately know they are rooming with a student of the opposite sex.

## VI.    The Waileses and The Rollers Separately Contact JeffCo with Concerns About the Policy

218.    After D.W. and B.R.'s distressing experiences, the Waileses and the Rollers each began searching for JeffCo's rooming Policy.

22

219. Because the Policy that governs overnight accommodations is buried within the Policy titled "Transgender Students," which is not shared with families before trips, neither family knew about this Policy.

220. Once the Waileses discovered this Policy, they decided to send a letter to JeffCo through counsel in December 2023.

221. The Waileses expressed concerns about JeffCo failing to inform parents that their Policy rooms children by gender identity rather than sex.

222. In D.W.'s case, she did not know she was assigned to a room with a male student, so the Waileses did not know they needed to request an accommodation.

223. In contrast, the male student placed in D.W.'s room knew the relevant information and could choose whether to room with girls or boys.

224. The Transgender Students Policy promotes the informational privacy of certain students but does not promote the physical privacy of *all* students.

225. Because JeffCo's Policy prioritizes the "safety and comfort" of only transgender students to the exclusion of all other students, there was no way for D.W.'s parents to request an accommodation before the trip so they could protect D.W.'s privacy and "minimiz[e]" her "stigmatization."

226. Because the Waileses could not request an accommodation before the trip, JeffCo placed an eleven-year-old child in a position where her privacy was violated and to make it stop, she had to admit she was uncomfortable sleeping in a bed with a male in front of other students.

227. JeffCo responded with a letter on December 21, 2023.

228. JeffCo would agree to one commitment: it "will not knowingly assign students of different birth sexes to share a bed."

229. Yet this is exactly what JeffCo did. And JeffCo promised nothing about sharing a room, bathroom, shower, or other private facilities.

230. The Waileses responded with a second letter and explained that JeffCo's promise regarding bed assignments is an empty promise.

231. For trips like the D.C. trip, JeffCo's practice is to assign four students to a room and then let them decide who sleeps in which of the two beds.

232. Thus, JeffCo essentially promised nothing as they do not assign students to beds.

233. But JeffCo's practice means it assigns four students to a room, knowing that one of the three girls in the room must share a bed with a male who identifies as a girl, without her knowledge or consent.

234. Furthermore, a student should not be forced to share a room with a classmate of the opposite sex any more than she should be forced to share a bed.

235. The same concerns apply to requiring a student to share a hotel room with a person of the opposite sex. They must sleep mere feet away from each other, shower, use the restroom, change their clothes, and take care of all personal hygiene needs within the same room and bathroom.

236. If a young girl like D.W. is uncomfortable sharing a bed with a male who identifies as a girl, she is also likely to be uncomfortable showering, dressing, and sleeping a few feet away from this student. Indeed, D.W. is uncomfortable showering, dressing, and sleeping a few feet away from a student of the opposite sex.

237. This is particularly important at Outdoor Lab, where multiple students are showering in shower stalls next to each other while the counselor, who could be of the opposite sex, stands outside the shower to time the students.

238. The Waileses asked JeffCo to ensure parents are the decision-makers regarding their children's privacy. The Waileses requested that JeffCo inform parents about the Policy before their child is placed overnight in a bed or room with a student of the opposite sex so they can make an informed decision about how to protect their child's privacy.

24

239. The Waileses also asked JeffCo to let parents decide whether their child is placed overnight in a bed or room with a student of the opposite sex by, for example, offering an opt-in or opt-out to the Policy.

240. This could be done while maintaining the privacy of all students.

241. There are many ways JeffCo could accomplish this. For instance, when parents fill out the registration forms for any school-sponsored trip, the district could ask: "Do you submit to Policy JB-R2, which allows students to stay in the same room or bed with a child of the opposite sex who identifies as transgender?"

242. Alternatively, JeffCo could obtain an opt-in to the Policy generally for all overnight trips at the beginning of the school year or obtain a verbal opt-in by calling parents when arranging trip rooms.

243. These solutions inform parents of JeffCo's Policy, allow them to opt into or out of the Policy before the trip, and allow them to choose the sex of their child's roommates without disclosing any student information.

244. JeffCo responded to the Waileses' second letter on February 5, 2024. The District indicated that it would not promise to inform parents of the District's overnight Policy ahead of a trip or provide an opt-in or opt-out ahead of a trip.

245. Instead, JeffCo relied on the Policy language stating that any student can request a "reasonable accommodation"—language it has since removed from the policy. *See* Ex. A.

246. Indeed, because of the set-up of Outdoor Lab, the district cannot provide *any* accommodation for students at Outdoor Lab as there are no private rooms available, and choosing your own roommates was not an option there.

247. JeffCo also misrepresented its student information system, Infinite Campus, to the Waileses by saying that it makes a student's "legal identity" tab—which lists the student's legal name and gender—only "viewable by a small handful of central staff and . . . only for certain legally required purposes."

25

248. Yet in a recent email sent by JeffCo to all district principals and registrars, JeffCo stated that when a parent requests a change in a student's gender, the "change will be visible to staff in the demographics tab," and "[l]egal gender is a required field."

249. The Waileses' twins B.W. and G.W. are already signed up to attend the Philadelphia/D.C. trip in June 2025.

250. The Waileses have been fundraising for this trip.

251. Yet the Waileses do not currently feel comfortable sending their children on the trip without a guarantee that the twins will not be put in a situation like what D.W. faced.

252. The Rollers also tried to bring their concerns regarding this Policy to JeffCo and were similarly rebuffed.

253. Following B.R.'s unexpected and uncomfortable experience at Outdoor Lab, Mrs. Roller made an appointment to speak with B.R.'s principal. The principal informed Mrs. Roller that the District abided by its Policy when it assigned this eighteen-year-old female counselor to the cabin with eleven- and twelve-year-old boys.

254. The principal stated that the District's Policy was written to protect students who identify as transgender and their privacy rather than the privacy of all students. As the Policy states, it "should be interpreted consistent with the goals of reducing the stigmatization of and improving the education integration of transgender and gender nonconforming students."

255. Mrs. Roller was not given a straight answer on who assigned the female counselor to her son's cabin.

256. Mrs. Roller asked the principal: "Would you allow an eighteen-year-old male to sleep with an eleven-year-old female?" The principal responded: "I've never thought of it that way."

26

257. Mrs. Roller explained how concerned she was about her daughter D.R., who still has three years left in JeffCo, being put in the same position.

258. Ultimately, the principal had no further answers for Mrs. Roller or advice on how to keep this from recurring.

259. Mrs. Roller then tried to contact the District administration with her concerns.

260. No one in the District administration would answer Mrs. Roller about how to avoid a similar situation in the future.

261. Once information about D.W. and B.R.'s experiences became public, the Perlmans learned about JeffCo's Transgender Students Policy for the first time and immediately became concerned about upcoming trips for their children.

## VII.    JeffCo's Transgender Students Policy is harming Plaintiffs

262. The Waileses and the Rollers have already been harmed by JeffCo's Transgender Students Policy. And all three families are at imminent risk of harm.

263. The Waileses and D.W. were harmed when D.W. was placed in a bed with a male student without her or her parents' knowledge or consent.

264. The Rollers and B.R. were harmed when B.R. was assigned to a cabin with a female student who was also told to supervise his shower. Neither the Rollers nor B.R. were informed that he would have a female counselor prior to the trip.

265. All three families have children in the district who will be attending JeffCo-sponsored trips in the months and years ahead.

266. Some trips are imminent, such as P.P. attending Outdoor Lab and the Wailes twins attending the D.C. trip, both of which will occur this school year.

267. Additionally, all Student Plaintiffs will be playing sports for JeffCo schools or participating in other extracurricular activities that include travel.

268. All three Wailes children are avid competitive swimmers and plan to swim for their JeffCo high school. D.W. plans to participate in volleyball. And G.W.

plays on the high school basketball feeder team and plans to play in high school as well.

269.    M.P. plans to participate in soccer, basketball, and softball. As she is now in high school, trips will begin to occur for her teams.

270.    D.R. currently participates in HOSA and plans to participate in soccer and DECA at her high school. DECA, a club for emerging leaders and entrepreneurs in marketing, finance, hospitality, and management, has trips this year for the State Competition in Colorado Springs and the International Competition in Orlando. HOSA, a club for students interested in health sciences, also has overnight competitions and conferences for students.

271.    B.R. will be playing football for his JeffCo high school in the future as well. Many athletic teams in JeffCo, including football, have a camp for students. During these camps, students stay overnight in assigned rooms, often in dormitories at a college.

272.    For many athletic teams and school-sponsored clubs, students and parents are not told ahead of time who the student-athlete will be rooming with. The student only finds out who they are rooming with once they arrive at camp or the tournament, once it is too late for Parent Plaintiffs to have any notice or involvement in rooming decisions or potential concerns.

273.    Despite the Waileses and Rollers requesting assistance from the District, JeffCo has simply refused to provide an accommodation for any family concerned about their child's privacy on school trips.

274.    Even though a student who identifies as "transgender" is permitted to choose whether they room with male or female students, JeffCo will not allow Student Plaintiffs the choice to only room with students who share their sex.

275.    JeffCo also refuses to provide information about their rooming Policy to parents when they sign their children up for a trip or activity.

28

276.    The Waileses, the Rollers, and the Perlmans are currently being harmed by JeffCo's Transgender Students Policy.

277.    Each family has children currently attending JeffCo schools who are eager to participate in curricular and extracurricular trips.

278.    These trips would provide opportunities to learn, grow, and explore and could lead to future college scholarships, particularly in athletics.

279.    If Parent Plaintiffs keep their children home because of JeffCo's refusal to accommodate their religious beliefs, Student Plaintiffs will miss out on these opportunities, which could harm their future opportunities.

280.    Additionally, it will cause conflict for the Student Plaintiffs as all of these activities involve team competitions where Student Plaintiffs would be letting their team down by failing to attend.

281.    But JeffCo has left these families with only two options: either force your child to miss out on formative academic and extracurricular trips or allow your child to attend knowing there is a real risk JeffCo will place them in a room or bed with a student of the opposite sex without forewarning or an opportunity to consent.

282.    Because of this Policy and JeffCo's refusal to provide any type of accommodation, Student Plaintiffs are at an imminent risk of having their privacy violated on rapidly approaching trips.

**CAUSES OF ACTION**

283.    All the acts, policies, and practices alleged in this Complaint and attributed to Defendants were undertaken and maintained under color of law.

284.    Pursuant to the District's policies, practices, customs, and usages, Defendants place children in overnight accommodations with children of the opposite sex without the consent of parents or students.

29

285. Pursuant to the District's policies, practices, customs, and usages, Defendants will not provide an accommodation for parents or students who will not consent to sharing overnight lodging with a student of the opposite sex.

286. Pursuant to the District's policies, practices, customs, and usages, Defendants mislead parents by telling them students are only roomed with students of the same sex.

287. Pursuant to the District's policies, practices, customs, and usages, Defendants will again place children in overnight accommodations with someone of the opposite sex in the future.

288. Pursuant to the District's policies, practices, customs, and usages, Defendants placed D.W. and B.R. in overnight accommodations with someone of the opposite sex without offering alternative arrangements.

289. And pursuant to the District's policies, practices, customs, and usages, Defendants misled Parent Plaintiffs Mr. and Mrs. Wailes and Mr. and Mrs. Roller by telling them their children would not room with anyone of the opposite sex but instead placed the children in overnight accommodations with someone of the opposite sex.

290. Those policies, practices, customs, and usages remain in full force and effect.

291. Defendants' actions are not narrowly tailored to a compelling governmental interest, substantially related to an important governmental interest, or rationally related to a legitimate governmental purpose.

292. Defendants' actions are not the least restrictive means of—or narrowly tailored toward—pursuing a compelling governmental interest.

293. Plaintiffs have suffered irreparable harm because of Defendants' actions.

294. Absent an injunction, Parent Plaintiffs and Student Plaintiffs will continue to suffer irreparable harm for which they lack an adequate remedy at law.

295. The threat of irreparable harm to Parent Plaintiffs and Student Plaintiffs outweighs any alleged harm Defendants may claim an injunction would cause them.

296. An injunction will not adversely affect the public interest.

## FIRST CAUSE OF ACTION
### Parent Plaintiffs' Fundamental Right to Direct
### Their Children's Upbringing & Education

### (U.S. Const. amend. XIV; 42 U.S.C. § 1983)

297. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–296 of this Complaint.

298. The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," or from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

299. This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997).

300. Among the fundamental rights and liberty interests the Constitution protects is "the [liberty] interest of parents in the care, custody, and control of their children"—"perhaps the oldest of the fundamental liberty interests recognized" by the Supreme Court. *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.).

301. Fundamental parental rights have deep common-law roots. *See, e.g.*, 1 William Blackstone, *Commentaries on the Laws of England* \*446–53 (describing the rights of parents at common law in England), http://bit.ly/3leX7za; 2 James Kent, *Commentaries on American Law* \*189–217 (10th ed. 1860) (same, in the United States), https://bit.ly/3ttTN79.

31

302.    This includes parents' fundamental right to establish a home and bring up children, including by making decisions about their children's upbringing and education.

303.    Parents' fundamental right to make decisions about the upbringing and education of their children is "objectively, 'deeply rooted in this Nation's history and tradition.'" *Glucksberg*, 521 U.S. at 720–21 (citation omitted); *see Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203 (10th Cir. 2003).

304.    That fundamental right includes the right to instill moral and religious values in their children on topics like a child's identity as a male or a female, a child's bodily privacy, sexual modesty, and interactions with the opposite sex.

305.    It also includes the right to protect their children from violation of their bodily privacy by exposure to the opposite sex in intimate settings, like overnight accommodations or shower facilities.

306.    And it includes the right to determine (1) whether their children should expose, or risk exposing, their bodies or intimate activities to the opposite sex, and (2) whether their children should be exposed, or risk being exposed, to the bodies or intimate activities of the opposite sex.

307.    Overnight accommodations, along with restrooms, locker rooms, and shower facilities, are spaces where students under the school's custodial responsibility are most likely to expose their bodies or intimate activities to the opposite sex or be exposed to the bodies or intimate activities of the opposite sex.

308.    Parents' fundamental right to make decisions about their children's upbringing and education reaches its peak on matters of great importance.

309.    Questions about children's identity as male or female and what that identity means for their lives, including their bodily privacy, sexual modesty, and interactions with the opposite sex are matters of great importance that fall within

32

parents' fundamental right to counsel their children and make decisions about their children's upbringing and education.

310.   The government infringes parents' fundamental decisionmaking rights when it refuses to give them important information about their child, because parents cannot make decisions about their children's education or any other matter without that information.

311.   It is not for Defendants to make decisions about those matters on behalf of children; it is each parent's fundamental right to make such decisions for his or her own children.

312.   Before D.W.'s and B.R's participation in the Philadelphia/DC trip and Outdoor Lab, Defendants told the Waileses and the Rollers that they would provide sex-specific overnight accommodations—that is, one set of accommodations designated for boys and the other for girls.

313.   Despite telling this to the Waileses and the Rollers, Defendants did not provide sex-specific overnight accommodations.

314.   Instead, as required by the Transgender Students Policy, Defendants placed the Waileses' daughter in a hotel room with a male and the Rollers' son in a cabin with a female without notifying Parent Plaintiffs or seeking their consent.

315.   The Waileses and the Rollers each requested an accommodation from the Policy to ensure that Defendants do not again place their children in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's asserted gender identity.

316.   Defendants refused the Waileses' and the Rollers' requests to provide an accommodation prior to future trips.

317.   Defendants also refused to provide advance notice to Parent Plaintiffs about whether their children will be placed in a hotel room, cabin, or other overnight accommodation with a person of the opposite sex.

318.    Parent Plaintiffs object to the Policy of placing their children in overnight accommodations with someone of the opposite sex because of the moral and religious values Parent Plaintiffs seek to instill in their children about each child's identity as male or female; the implications of that identity for the child's bodily privacy, sexual modesty, and interactions with the opposite sex; and other matters.

319.    Parent Plaintiffs also object to the Policy because of their desire to protect their children from violation of their bodily privacy by exposure to the opposite sex in intimate settings, like overnight accommodations or shower facilities.

320.    Parent Plaintiffs further object to the Policy because they do not want their children's bodies or intimate activities to be exposed, or risk being exposed, to members of the opposite sex, nor do they want their children to be exposed to the bodies or intimate activities of a member of the opposite sex.

321.    The Waileses and the Rollers additionally object to the Policy due to the discomfort, stress, and anxiety it has caused their children who were placed in intimate settings with students of the opposite sex and the stress and anxiety their children feel knowing Defendants' Policy permits them to be placed in intimate settings with children of the opposite sex in the future.

322.    By placing D.W. and B.R. in overnight accommodations with someone of the opposite sex without notifying Parent Plaintiffs or seeking their consent, and by concealing from parents that overnight accommodations would not be sex-specific, Defendants violated Parent Plaintiffs' fundamental right to make decisions about the upbringing and education of their children.

323.    The Waileses' twins B.W. and G.W. would like to attend the JeffCo Washington D.C./Philadelphia trip in June 2025.

324.    And the Perlmans' son P.P. intends to attend JeffCo's Outdoor Lab trip during the 2024/2025 school year.

34

325. The Perlmans' daughter M.P. would also like to attend any athletic trips that occur during the 2024/2025 school year.

326. The Constitution requires courts to presume that parents will act in the best interests of their children.

327. Cutting parents out of decisions on these important issues conflicts with that presumption and violates fundamental parental rights.

328. Without reliable information about overnight accommodations, Parent Plaintiffs cannot make informed decisions about the upbringing and education of their children.

329. By denying Parent Plaintiffs such information even after they have asked for it, the Policy and Defendants' actions to implement it prevent Parent Plaintiffs from making informed decisions about the upbringing and education of their children.

330. By falsely promising Plaintiffs sex-specific overnight accommodations while intentionally withholding such accommodations, the Policy and Defendants' actions to implement it prevent Parent Plaintiffs from making informed decisions about the upbringing and education of their children.

331. The Policy and Defendants' actions to implement it condition Parent Plaintiffs' receipt of a government benefit—here, the Philadelphia/DC trip, Outdoor Lab, and any other extracurricular educational or athletic opportunity that includes an overnight trip—on their waiver of Fourteenth Amendment rights.

332. The Policy and Defendants' actions to implement it substantially interfere with Parent Plaintiffs' fundamental right to direct the upbringing and education of their children.

333. The Policy and Defendants' actions to implement it violate Parent Plaintiffs' fundamental rights under the Fourteenth Amendment.

334.    Because Defendants have refused to grant the Parent Plaintiffs' request for an accommodation from the Policy on future trips, Defendants will again violate the Parent Plaintiffs' fundamental right to make decisions about the upbringing and education of their children.

335.    The Policy is legislative action by the Board, and this violation of Parent Plaintiffs' rights results from the concerted action of multiple District employees pursuant to that Policy.

336.    Defendants' infringement of Parent Plaintiffs' fundamental rights is presumptively unconstitutional.

337.    Strict scrutiny applies to the Policy and Defendants' actions to implement it, because they violate Parent Plaintiffs' fundamental rights.

338.    The Policy and Defendants' actions to implement it are not narrowly tailored to any compelling interest, substantially related to any important interest, or rationally related to any legitimate interest.[2]

339.    By violating Parent Plaintiffs' fundamental rights, Defendants have irreparably harmed Parent Plaintiffs and, absent an injunction, will continue to irreparably harm Parent Plaintiffs.

340.    An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

341.    The Policy is a policy, practice, custom, and usage of the District, and Defendants' illegal actions implement a policy, practice, custom, and usage of the District.

---

[2] Even though fundamental rights claims should receive strict scrutiny, some courts incorrectly apply the shocks the conscience test. Because some courts mistakenly apply this test, Parent Plaintiffs add that Defendants' intentional failure to provide them complete and accurate information—a failure required by the Policy—along with Defendants' placement of Student Plaintiffs in overnight accommodations with the opposite sex despite Parent Plaintiffs' objections, shocks the judicial conscience.

342.    Defendants' violation of Parent Plaintiffs' fundamental rights has caused them to suffer damages including the cost of the Philadelphia/D.C. trip for D.W. and Serena, the cost of Outdoor Lab for B.R., the cost of attending meetings with District officials, drafting letters to the District, and such other damages to which Plaintiffs may be entitled.

## SECOND CAUSE OF ACTION
### Parent Plaintiffs' Free Exercise of Religion
### (U.S. Const. amends. I, XIV; 42 U.S.C. § 1983)

343.    Plaintiffs repeat and reallege each of the allegations in paragraphs 1–296 of this Complaint.

344.    The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see id.*, amend. XIV.

345.    Parent Plaintiffs' free-exercise rights include the right to raise their children in accordance with their religious beliefs and the right to direct their children's education and upbringing consistent with their religious beliefs, including the immutability of sex, their beliefs about bodily privacy, interactions with the opposite sex, and sexual modesty. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 140 S. Ct. 2246, 2261 (2020); *Emp. Div., Dep't of Hum. Res. v. Smith*, 494 U.S. 872, 881–82 (1990); *Parham v. J.R.*, 442 U.S. 584, 590 (1979); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 518 (1925).

346.    Parent Plaintiffs have a sincere religious belief that they must teach their children to practice modesty and protect their children's modesty. This requires that their children not undress, use the restroom, shower, complete other intimate activities, or share overnight accommodations with the opposite sex.

347.    Parent Plaintiffs have a sincere religious belief that God created all people in His image as male and female. *Genesis* 1:27; *Genesis* 5:2.

37

348.    Parent Plaintiffs believe that a person's sex is binary and fixed at conception. They do not believe a person can change their sex.

349.    Because Parent Plaintiffs do not believe a person can change their sex, it violates their beliefs for Defendants to room their children with a member of the opposite sex, regardless of the student's gender identity.

350.    Parent Plaintiffs object to the Policy and Defendants' actions to implement it because of their sincerely held religious beliefs about modesty, the immutability of sex, interactions between the sexes, and other matters.

351.    Overnight accommodations, along with restrooms, locker rooms, and shower facilities, are spaces where students under the school's custodial responsibility are most likely to expose their bodies or intimate activities to the opposite sex or be exposed to the bodies or intimate activities of the opposite sex.

352.    Before D.W.'s and B.R.'s participation in the Philadelphia/DC trip and Outdoor Lab, Defendants told Parent Plaintiffs that overnight accommodations would be sex-specific—that is, one set of overnight accommodations designated for boys and the other for girls.

353.    Despite telling this to Parent Plaintiffs, Defendants did not create sex-specific overnight accommodations.

354.    Instead, as required by the Policy, Defendants placed Parent Plaintiffs' children in a hotel room or cabin with someone of the opposite sex without notifying Parent Plaintiffs or seeking their consent.

355.    Parent Plaintiffs requested an accommodation from the Policy to ensure that Defendants do not again place their children in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's asserted gender identity.

356.    Defendants have refused that requested accommodation.

357.    Defendants have also refused to provide advanced notice to Parent Plaintiffs about whether their children will be placed in a hotel room, cabin, or other overnight accommodation with a person of the opposite sex.

358.    By placing Parent Plaintiffs' children in overnight accommodations with someone of the opposite sex without notifying them or seeking their consent, and by concealing from parents that overnight accommodations would not be sex-specific, Defendants substantially burdened Parent Plaintiffs' sincerely held religious beliefs about the immutability of sex, modesty, and interactions between the sexes and their ability to exercise those beliefs. Absent an injunction, Defendants will continue to do so.

359.    The Policy and Defendants' actions to implement it also condition Parent Plaintiffs' receipt of a government benefit—here, the Philadelphia/DC trip, Outdoor Lab, and overnight sports trips—on their waiver of First Amendment rights.

360.    The First Amendment bars application of even a neutral, generally applicable law or government policy to religiously motivated action when that action implicates parents' right to direct the upbringing and education of their children.

361.    Because the Policy and Defendants' actions to implement it substantially burdened Parent Plaintiffs' right to exercise their religion by directing their children's upbringing and education, they receive strict scrutiny.

362.    The Policy and Defendants' actions to implement it also receive strict scrutiny because they were neither neutral toward religion nor generally applicable.

363.    Defendants consider whether to place students in overnight accommodations with the opposite sex on a case-by-case basis.

364.    Applying that instruction to Student Plaintiffs required, and continues to require, Defendants to take their individualized circumstances into consideration when deciding whether to place Student Plaintiffs in overnight accommodations with

the opposite sex, whether to notify Parent Plaintiffs, or whether to seek their consent, among other discretionary considerations.

365. The discretionary nature of this inquiry renders the Policy and Defendants' actions to implement it neither neutral nor generally applicable.

366. Because the Policy and Defendants' actions to implement it interfere with Parent Plaintiffs' First Amendment right to direct their children's education and upbringing, and because those actions are neither neutral toward religion nor generally applicable, they receive strict scrutiny.

367. As a result, the Policy and Defendants' actions to implement it are presumptively unconstitutional.

368. The Policy and Defendants' actions to implement it are not narrowly tailored to any compelling interest, substantially related to any important interest, or rationally related to any legitimate interest.

369. Nor have Defendants used the least restrictive means of—or narrowly tailored their actions toward—serving any interest they may have.

370. Because Defendants have refused to accommodate Parent Plaintiffs' request that Student Plaintiffs are not again placed in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, Defendants will again violate Parent Plaintiffs' free-exercise rights.

371. By violating Parent Plaintiffs' free-exercise rights protected by the First Amendment, Defendants have irreparably harmed Parent Plaintiffs and, absent an injunction, will continue to irreparably harm Parent Plaintiffs.

372. An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

373. The Policy is a policy, practice, custom, and usage of the District, and Defendants' illegal actions implement a policy, practice, custom, and usage of the District.

374. Defendants' violation of Parent Plaintiffs' free-exercise rights has caused them to suffer damage including the cost of the Philadelphia/D.C. trip for D.W. and Serena, the cost of Outdoor Lab for B.R., the cost of attending meetings with District officials, drafting letters to the District, and such other damages to which Plaintiffs may be entitled.

**THIRD CAUSE OF ACTION**
**Student Plaintiffs' Fundamental Right to Bodily Privacy**
**(U.S. Const. amend. XIV; 42 U.S.C. § 1983**

375. Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–296 of this Complaint.

376. The Fourteenth Amendment prohibits the States from "mak[ing] or enforc[ing] any law which shall abridge the privileges or immunities of citizens of the United States," or from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

377. This Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Glucksberg*, 521 U.S. at 720.

378. Fundamental rights and liberty interests are those deeply rooted in the Nation's history and tradition and implicit in the concept of ordered liberty.

379. Deeply rooted in our Nation's history and tradition is the fundamental right of bodily privacy.

380. The fundamental right of bodily privacy protects students from exposing, or the risk of exposing, their bodies or intimate activities to the opposite sex. *See, e.g.*, *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 801 (11th Cir. 2022) (en banc) (discussing the "long tradition in this country of separating sexes in some, but not all, circumstances"); W. Burlette Carter, *Sexism in the "Bathroom Debates": How Bathrooms Really Became Separated by Sex*, 37 Yale L. &

Pol'y Rev. 227, 244–54 (2018) (tracing the history of "intimate spaces" like bathrooms and explaining "why sex-separation was the dominant choice" from before this Nation's founding).

381.    The fundamental right of bodily privacy also protects students from being exposed, or the risk of being exposed, to the body or intimate activities of the opposite sex.

382.    This fundamental right is implicit in the concept of ordered liberty, because it reflects that an important aspect of most people's sense of self-respect and personal dignity is the ability to be clothed in the presence of the opposite sex and the freedom to attend to intimate activities outside the presence of the opposite sex.

383.    A government that compels its citizens to disrobe or attend to intimate activities in the presence of the opposite sex violates this personal right implicit in the concept of ordered liberty.

384.    Overnight accommodations, along with restrooms, locker rooms, and shower facilities, are spaces where students under the school's custodial responsibility are most likely to expose their bodies or intimate activities to the opposite sex or be exposed to the bodies or intimate activities of the opposite sex.

385.    Student Plaintiffs enjoy this fundamental right of bodily privacy.

386.    Prior to Student Plaintiffs' participation in the Philadelphia/DC trip and Outdoor Lab, Defendants told the Waileses and the Rollers that overnight accommodations would be sex-specific—that is, one set of accommodations designated for boys and the other for girls.

387.    Despite telling this to Parent Plaintiffs, Defendants did not create sex-specific overnight accommodations.

388.    Instead, as required by the Policy, Defendants placed D.W. in a hotel room and B.R. in a cabin with a student of the opposite sex.

389.    The Waileses sent two letters to JeffCo administration requesting an accommodation for their children during future trips to ensure that Defendants do not again place their children in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's asserted gender identity.

390.    Similarly, the Rollers spoke with their school principal and JeffCo administration about opting out of the Policy in the future.

391.    Defendants have refused all three requests for an accommodation.

392.    Student Plaintiffs object to being placed in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's gender identity.

393.    Placing Student Plaintiffs in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex places them at risk of exposing their bodies or intimate activities to the opposite sex or being exposed to the bodies or intimate activities of the opposite sex.

394.    Forcing Student Plaintiffs to undergo that risk violates their fundamental right to bodily privacy.

395.    By placing D.W. and B.R. in a hotel room or cabin with someone of the opposite sex, Defendants violated their fundamental right to bodily privacy.

396.    The Policy and Defendants' actions to implement it caused the Rollers' son—B.R.—to expose himself to a student of the opposite sex. B.R. spent four days and three nights being forced to sleep, change, and shower in front of an eighteen-year-old girl who was placed in B.R.'s cabin by JeffCo employees, all while B.R. could not contact his parents because no phones, computers, etc. are permitted.

397.    All Student Plaintiffs face the risk of exposing their bodies or intimate activities to the opposite sex or being exposed to the bodies or intimate activities of the opposite sex on any future trip they take with JeffCo.

43

398. The Policy and Defendants' actions to implement it also condition Student Plaintiffs' receipt of a government benefit—here, the Philadelphia/DC trip, Outdoor Lab, and overnight sports trips—on their waiver of the Fourteenth Amendment's right to privacy.

399. This harms Student Plaintiffs by forcing them to surrender their fundamental right to bodily privacy unless they are willing to forgo their access to the government benefit of the Philadelphia/DC trip, Outdoor Lab, and overnight sports trips.

400. The Policy and Defendants' actions to implement it violate the Fourteenth Amendment by substantially interfering with Student Plaintiffs' fundamental right to bodily privacy.

401. Because Defendants have refused to accommodate Parent Plaintiffs' request that Student Plaintiffs are not again placed in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, Defendants will again violate Student Plaintiffs' fundamental right to bodily privacy.

402. The Policy is legislative action by the Board, and this violation of Student Plaintiffs' rights results from the concerted action of multiple District employees pursuant to that Policy.

403. Defendants' infringement of Student Plaintiffs' fundamental rights is presumptively unconstitutional.

404. Strict scrutiny applies to the Policy and Defendants' actions to implement it.

405. The Policy and Defendants' actions to implement it are not narrowly tailored to any compelling interest, substantially related to any important interest, or rationally related to any legitimate interest.[3]

---

[3] Even though fundamental rights claims should receive strict scrutiny, some courts incorrectly apply the shocks the conscience test. Because some courts mistakenly

406.    By violating Student Plaintiffs' fundamental rights protected by the Fourteenth Amendment, Defendants have irreparably harmed Student Plaintiffs and, absent an injunction, will continue to irreparably harm Student Plaintiffs.

407.    An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

408.    The Policy is a policy, practice, custom, and usage of the District, and Defendants' illegal actions implement a policy, practice, custom, and usage of the District.

409.    Defendants' violation of Student Plaintiffs' fundamental rights has caused them to suffer damages including the cost of the Philadelphia/D.C. trip for D.W. and Serena, the cost of Outdoor Lab for B.R., the cost of attending meetings with District officials, drafting letters to the District, and such other damages to which Plaintiffs may be entitled.

## FOURTH CAUSE OF ACTION
### Student Plaintiffs' Free Exercise of Religion
### (U.S. Const. amends. I, XIV; 42 U.S.C. § 1983)

410.    Plaintiffs repeat and reallege each of the allegations contained in paragraphs 1–296 of this Complaint.

411.    The First Amendment, incorporated against the States by the Fourteenth Amendment, bars state laws "prohibiting the free exercise [of religion]." U.S. Const. amend. I; *see id.* amend. XIV.

412.    Student Plaintiffs' sincerely held religious beliefs require them to avoid intimate exposure, or the risk of intimate exposure, of their own bodies or intimate activities to the opposite sex.

---

apply this test, Student Plaintiffs add that Defendants' placement of them in hotel rooms, cabins, or other overnight accommodations over their objections and those of Parent Plaintiffs, along with Defendants' concealment from Parent Plaintiffs that such accommodations would not be sex-specific, shocks the judicial conscience.

413. Student Plaintiffs' sincerely held religious beliefs also require them to avoid intimate exposure, or the risk of intimate exposure, to the body or intimate activities of someone of the opposite sex.

414. Student Plaintiffs' beliefs require that they not undress, use the restroom, shower, complete other intimate activities, or share overnight accommodations with the opposite sex.

415. Student Plaintiffs have a sincere religious belief that God created all people in His image as male and female. *Genesis* 1:27; *Genesis* 5:2.

416. Student Plaintiffs believe that a person's sex is binary and fixed at conception. They do not believe a person can change their sex.

417. Because Student Plaintiffs do not believe a person can change their sex, it violates their beliefs for Defendants to room them with a member of the opposite sex, regardless of the student's gender identity.

418. The Policy and Defendants' actions to implement it force Student Plaintiffs to violate their sincerely held religious beliefs about modesty, the immutability of sex, the relationship between the sexes, and other matters.

419. Overnight accommodations, along with restrooms, locker rooms, and shower facilities, are spaces where students under the school's custodial responsibility are most likely to expose their bodies or intimate activities to the opposite sex or be exposed to the bodies or intimate activities of the opposite sex.

420. Thus, placing Student Plaintiffs in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex places them at risk of exposing their bodies or intimate activities to the opposite sex or being exposed to the bodies or intimate activities of the opposite sex.

421. Before Student Plaintiffs' participation in the Philadelphia/DC trip and Outdoor Lab, Defendants told Parent Plaintiffs that overnight accommodations

46

would be sex-specific—that is, one set of accommodations designated for boys and the other for girls.

422. Despite telling this to Parent Plaintiffs, Defendants did not create sex-specific overnight accommodations.

423. Instead, as required by the Policy, Defendants placed D.W. and B.R. in a hotel room or cabin with a student of the opposite sex.

424. Parent Plaintiffs requested an accommodation from the Policy to ensure that Defendants do not again place any Student Plaintiffs in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's asserted gender identity.

425. Defendants have refused that requested accommodation.

426. Placing Student Plaintiffs in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, regardless of that person's gender identity, substantially burdens Student Plaintiffs' sincerely held religious beliefs.

427. By placing D.W. and B.R. in a hotel room or cabin with someone of the opposite sex, Defendants substantially burdened their sincerely held religious beliefs.

428. The Policy and Defendants' actions to implement it caused the Rollers' son—B.R.—to expose himself to a student of the opposite sex who was over the age of majority. B.R. spent four days and three nights being forced to experience the stress and discomfort of sleeping, changing, and showering in front of an eighteen-year-old female who was placed in his cabin by JeffCo employees, without being able to contact his parents.

429. All Student Plaintiffs face the risk of intimate exposure to a student of the opposite sex on any future trip they take with JeffCo.

430. The Policy and Defendants' actions to implement it also condition Student Plaintiffs' receipt of a government benefit—here, the Philadelphia/DC trip, Outdoor Lab, and overnight sports trips—on their waiver of First Amendment rights.

47

431. This unconstitutional condition harms Student Plaintiffs by forcing them to surrender their right to exercise their religion unless they are willing to forgo their access to the government benefit of the Philadelphia/DC trip, Outdoor Lab, and overnight sports trips.

432. The Policy and Defendants' actions to implement it receive strict scrutiny because they were neither neutral towards religion nor generally applicable.

433. Defendants consider whether to place students in overnight accommodations with the opposite sex on a case-by-case basis.

434. Applying that instruction to Student Plaintiffs required, and continues to require, Defendants to take their individualized circumstances into consideration when deciding whether to place them in overnight accommodations with the opposite sex, whether to notify Parent Plaintiffs, whether to seek their consent, or other discretionary matters.

435. The discretionary nature of this inquiry renders the Policy and Defendants' actions to implement it neither neutral nor generally applicable.

436. As a result, the Policy and Defendants' actions to implement it are presumptively unconstitutional.

437. The Policy and Defendants' actions to implement it are not narrowly tailored to any compelling interest, substantially related to any important interest, or rationally related to any legitimate interest.

438. Nor have Defendants used the least restrictive means of—or narrowly tailored their actions toward—serving any interest they may have.

439. Because Defendants have refused to accommodate Parent Plaintiffs' request that Student Plaintiffs are not again placed in a hotel room, cabin, or other overnight accommodation with someone of the opposite sex, Defendants will violate Student Plaintiffs' free-exercise rights in the future.

48

440.    By violating Student Plaintiffs' free-exercise rights protected by the First Amendment, Defendants have irreparably harmed Student Plaintiffs and, absent an injunction, will continue to irreparably harm Student Plaintiffs.

441.    An injunction preventing Defendants from further constitutional violations would not harm them and would be in the public interest.

442.    The Policy is a policy, practice, custom, and usage of the District, and Defendants' illegal actions implement a policy, practice, custom, and usage of the District.

443.    Defendants' violation of Student Plaintiffs' free-exercise rights has caused them to suffer damages, including the cost of the Philadelphia/D.C. trip for D.W. and the cost of Outdoor Lab for B.R.

## **PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment against Defendants and provide the following relief:

i)    A declaration that the Policy facially and as applied by Defendants to Plaintiffs violates their First and Fourteenth Amendment rights under the United States Constitution;

ii)    An injunction that:

(a)    Requires Defendants to provide Parents Plaintiffs with notice ahead of a trip that their child could be roomed with a student of the opposite sex;

(b)    Requires Defendants to honor a request by Parent Plaintiffs that their children not be placed in overnight accommodations with a person of the opposite sex, regardless of that person's gender identity;

49

      (c)     Requires Defendants to honor a request by Student Plaintiffs that they not be placed in overnight accommodations with a person of the opposite sex, regardless of that person's gender identity;

iii)    Nominal damages, compensatory damages, and such other damages to which Plaintiffs may be entitled;

iv)    Plaintiffs' reasonable attorneys' fees, costs, and other costs and disbursements in this action pursuant to 42 U.S.C. § 1988; and

v)    All other further relief to which Plaintiffs may be entitled.

Dated: September 4, 2024

Respectfully submitted,

s/ Katherine L. Anderson

Noel W. Sterett
IL Bar No. 6292008
Mallory B. Sleight
NE Bar No. 27129
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
nsterett@ADFlegal.org
msleight@ADFlegal.org

Katherine L. Anderson
AZ Bar No. 33104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

David A. Cortman
GA Bar No. 188810
ALLIANCE DEFENDING FREEDOM
1000 Hurricane Shoals Road N.E.,
  Suite D1100
Lawrenceville, Georgia 30043
(770) 339-0774
dcortman@ADFlegal.org

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1-4, 8-10, 11-18, 31-33, 39-123, 201-214, 216-251, 262-263, 265-268, 272-282 of the foregoing Verified Complaint are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on September 3, 2024. in Littleton, Colorado.

Joseph Wailes

51

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1-3, 5-6, 8-10, 19-24, 31-33, 124-179, 201-219, 224, 233-235, 237, 240-243, 246, 252-260, 262, 264-265, 267, 270-282 of the foregoing Verified Complaint are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on September 3, 2024, in Conifer, Colorado.

Bret Roller

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual allegations in paragraphs 1-3, 7-10, 25-29, 31-33, 180-214, 216-217, 224, 233-235, 237, 240-243, 246, 261, 262, 265-267, 269, 272-282 of the foregoing Verified Complaint are true and correct to the best of my knowledge, and that these statements are based on my personal knowledge.

Executed on September 3, 2024, in Golden, Colorado.

Robert Perlman