**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No.: 1:24-cv-02439-RMR-NRN

JOSEPH and SERENA WAILES, et al.,

Plaintiffs,

v.

JEFFERSON COUNTY PUBLIC
SCHOOLS, et al.,

Defendants.

---

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND ARGUMENTS IN
SUPPORT**

**Oral Argument Requested**

---

# TABLE OF CONTENTS

Motion ..................................................................................................................... 1

Summary Of The Argument ..................................................................................... 2

Statement Of Facts .................................................................................................. 4

    A.    JeffCo's Overnight Accommodations Policy ..................................................... 4

    B.    Plaintiffs' upcoming overnight trips ................................................................. 5

    C.    JeffCo refuses to address Plaintiffs' concerns ................................................ 8

Legal Standard ........................................................................................................ 9

Argument ............................................................................................................... 10

I.    Plaintiffs are likely to succeed on the merits of their claims. .............................. 10

    A.    JeffCo's policy violates Plaintiffs' religious exercise. ..................................... 10

        i.    JeffCo's policy penalizes Plaintiffs' religious exercise ............................. 12

        ii.    JeffCo's policy is not neutral or generally applicable. ............................. 13

            a.    JeffCo's policy allows secular accommodations for students who identify as transgender but no accommodations, including religious accommodations, for others ............................................ 13

            b.    JeffCo's policy creates a system of individualized assessments ... 15

        iii.    JeffCo's policy burdens hybrid rights. ...................................................... 16

    B.    JeffCo's policy violates Plaintiff Students' right to bodily privacy. .................. 16

    C.    JeffCo's policy violates Parent Plaintiffs' fundamental right to direct their children's religious upbringing and protect their bodily privacy ...................... 19

    D.    JeffCo's policy fails strict scrutiny. ................................................................ 23

        i.    JeffCo lacks a compelling interest to justify the constitutional harms ....... 23

        ii.    JeffCo's policy is not narrowly tailored. .................................................... 23

II.    Plaintiffs' likelihood of success on any of their constitutional claims is determinative of the remaining factors ................................................................. 25

Conclusion ........................................................................................................... 25

Certificate Of Service ......................................................................................... 27

# TABLE OF AUTHORITIES

**Cases**

*Arnold v. Board of Education of Escambia County*,
    880 F.2d 305 (11th Cir. 1989)................................................................. 20

*Awad v. Ziriax*,
    670 F.3d 1111 (10th Cir. 2012)........................................................ 10, 25

*Axson-Flynn v. Johnson*,
    356 F.3d 1277 (10th Cir. 2004)........................................................ 15, 16

*Ballard v. United States*,
    329 U.S. 187 (1946)................................................................................ 17

*Beard v. Whitmore Lake School District*,
    402 F.3d 598 (6th Cir. 2005)................................................................. 18

*Burwell v. Hobby Lobby Stores, Inc.*,
    573 U.S. 682 (2014).................................................................................. 9

*C.N. v. Ridgewood Board of Education*,
    430 F.3d 159 (3d Cir. 2005)............................................................ 20, 21

*Canedy v. Boardman*,
    16 F.3d 183 (7th Cir. 1994).............................................................. 16, 18

*Carroll Independent School District v. U.S. Department of Education*,
    No. 4:24-cv-00461, 2024 WL 3381901 (N.D. Tex. July 11, 2024) .......................... 14

*Carson v. Makin*,
    596 U.S. 767 (2022)........................................................................... 12, 13

*Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*,
    508 U.S. 520 (1993).......................................................................... 15, 23

*City of Philadelphia v. Pennsylvania Human Relations Commission*,
    300 A.2d 97 (Pa. Commw. Ct. 1973) ..................................................... 18

*Cumbey v. Meachum*,
    684 F.2d 712 (10th Cir. 1982)................................................................ 16

*Dobbs v. Jackson Women's Health Organizaton*,
    597 U.S. 215 (2022)................................................................................ 19

iv

*Doe v. Luzerne County*,
  660 F.3d 169 (3rd Cir. 2011)................................................................ 16, 17

Employment Division, Department of Human Resources of Oregon v. Smith,
  494 U.S. 872 (1990)................................................................ 10, 12, 15, 16

Espinoza v. Montana Department of Revenue,
  591 U.S. 464 (2020)................................................................................ 11

*Faulkner v. Jones*,
  10 F.3d 226 (4th Cir. 1993)..................................................................... 17

*Fulton v. City of Philadelphia*,
  593 U.S. 522 (2021)................................................................ 14, 15, 16, 23

*Gruenke v. Seip*,
  225 F.3d 290 (3d Cir. 2000).................................................................. 20, 21

*Heideman v. South Salt Lake City*,
  348 F.3d 1182 (10th Cir. 2003).............................................................. 10, 25

*Hobby Lobby Stores, Inc. v. Sebelius*,
  723 F.3d 1114 (10th Cir. 2013)............................................................... 9, 10

*Johnston v. University of Pittsburgh*,
  97 F. Supp. 3d 657 (W.D. Pa 2015).............................................................. 18

*Kanuszewski v. Michigan Department of Health & Human Services*,
  927 F.3d 396 (6th Cir. 2019).................................................................. 21, 23

Kennedy v. Bremerton School District,
  597 U.S. 507 (2022)................................................................ 10, 12, 13

*Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*,
  507 U.S. 163 (1993)................................................................................ 20

*Merriken v. Cressman*,
  364 F. Supp. 913 (E.D. Pa. 1973)............................................................... 20

*Meyer v. Nebraska*,
  262 U.S. 390 (1923)............................................................................ 19, 20

*Michenfelder v. Sumner*,
  860 F.2d 328 (9th Cir. 1988)................................................................... 17

v

*Mirabelli v. Olson*,
    691 F. Supp. 3d 1197 (S.D. Cal. 2023) ............................................................ 21, 22

*Parham v. J.R.*,
    442 U.S. 584 (1979) ................................................................................................. 20

*Perry v. Sindermann*,
    408 U.S. 593 (1972) ................................................................................................. 13

Pierce v. Society of Sisters,
    268 U.S. 510 (1925) .................................................................................... 11, 19, 20

*Poe v. Leonard*,
    282 F.3d 123 (2d Cir. 2002) ................................................................................... 16

*Reed v. Town of Gilbert*,
    576 U.S. 155 (2015) ................................................................................................. 23

*Reno v. Flores*,
    507 U.S. 292 (1993) ................................................................................................. 19

Ricard v. USD 475 Geary County School Board,
    2022 WL 1471372 (D. Kan. May 9, 2022) ............................................................ 22

*Rocky Mountain Gun Owners v. Polis*,
    685 F. Supp. 3d 1033 (D. Colo. 2023) .................................................................... 1

*Shroff v. Spellman*,
    604 F.3d 1179 (10th Cir. 2010) ............................................................................. 16

*Speiser v. Randall*,
    357 U.S. 513 (1958) ................................................................................................. 13

*St. John's Home for Children v. West Virginia Human Rights Commission*,
    375 S.E.2d 769 (W. Va. 1988) ................................................................................ 17

*State v. Lawson*,
    340 P.3d 979 (Wash. App. 2014) ........................................................................... 17

*Torres v. Wisconsin Department of Health & Social Services*,
    859 F.2d 1523 (7th Cir. 1988) ......................................................................... 18, 19

Trinity Lutheran Church of Columbia, Inc. v. Comer,
    582 U.S. 449 (2017) ................................................................................................. 13

*Troxel v. Granville*,
530 U.S. 57 (2000).........................................................................................19, 20, 21

*United States v. Playboy Entertainment Group, Inc.*,
529 U.S. 803 (2000)........................................................................................ 24

*United States v. Virginia,*
518 U.S. 515 (1996)........................................................................................ 17

*Washington v. Glucksberg*,
521 U.S. 702 (1997)........................................................................................ 19

*Winnebago Tribe of Nebraska v. Stovall*,
341 F.3d 1202 (10th Cir. 2003) ........................................................................ 1

Wisconsin v. Yoder,
406 U.S. 205 (1972)........................................................................................ 11

*York v. Story*,
324 F.2d 450 (9th Cir. 1963) ........................................................................... 16

**Statutes**

Act of Mar. 24, 1887, ch. 103, § 2, 1887 Mass Acts, 668, 669 ...................................... 17

**Other Authorities**

Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy*, in
Person To Person 213 (George Graham & Hugh Lafollette eds., 1989)................. 18

Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*,
34 Vt. L. Rev. 655 (2010)................................................................................ 18

**Constitutional Provisions**

U.S. Const. amend. I ........................................................................................ 10

U.S. Const. amend. XIV ............................................................................... 10, 19

**MOTION**

This case is about whether Jefferson County Public Schools (JeffCo) can require students to share beds, bedrooms, and shower facilities with students of the opposite sex on school-sponsored overnight trips. Because this requirement violates Plaintiffs' constitutional rights—to free exercise, to bodily privacy, and to direct the care of their children—Plaintiffs move for a preliminary injunction under Fed. R. Civ. P.65(a). Plaintiffs ask the Court to preliminarily enjoin JeffCo from assigning Student Plaintiffs to beds, bedrooms, and shower facilities with students of the opposite sex during any school-sponsored overnight trips.

This preliminary injunction is necessary to stop further irreparable harm because, as explained below, Student Plaintiffs participate in school activities that will require school overnight trips this year and beyond. Because some of those trips start as early as November 5, 2024—a fact Plaintiffs just learned of—Plaintiffs ask the Court to consider this motion on an expedited basis. *See* Plaintiffs' Motion for Expedited Hearing. Plaintiffs also request oral argument on this motion.

Under Fed. R. Civ. P. 65(c), this Court has "wide discretion" in determining "whether to require security" when entering a preliminary injunction. *Winnebago Tribe of Neb. v. Stovall*, 341 F.3d 1202, 1206 (10th Cir. 2003). A bond is unnecessary here because JeffCo is unlikely to suffer financial harm if enjoined, *id*., and because Plaintiffs seek to enforce their constitutional rights against the government. *Rocky Mountain Gun Owners v. Polis*, 685 F. Supp. 3d 1033, 1061 (D. Colo. 2023).

Plaintiffs' counsel conferred with defendant's counsel, Isabel Boer, about this motion in accordance with D. Colo. L. Civ. R. 7.1(a). On September 27, Ms. Boer informed Plaintiffs' counsel that JeffCo does not consent to the requested relief. For the reasons below, Plaintiffs ask the Court to grant this motion and the relief requested.

## SUMMARY OF THE ARGUMENT

Each year, students attending JeffCo schools go on overnight school trips around the state, country, and world. Some trips are part of the curriculum, like the sixth-grade Outdoor Lab trip. Some are extracurricular, like the Washington D.C. trip. But every trip provides important educational opportunities for JeffCo students.

JeffCo has long promised parents that when children participate in overnight travel, JeffCo will room girls and boys separately. But as it became obvious during the 2023–24 school year, that is not JeffCo's policy. Instead, JeffCo rooms students by gender identity without notice to or permission from the students or their parents.

Joseph and Serena Wailes learned about JeffCo's policy only after their eleven-year-old daughter, D.W., was harmed by it. For eighteen months, JeffCo told them D.W. would be roomed with other female students on a female-only floor during the annual fifth-grade Washington D.C. trip. But as she was getting ready for bed on the first night of her much-anticipated trip, D.W. discovered that the student about to climb into bed with her was a male who identified as a girl.

Bret and Susanne Roller's son, B.R., suffered similarly during his sixth-grade Outdoor Lab trip. In the months before the trip, JeffCo repeatedly told the Rollers that B.R. would stay in an all-male cabin with other sixth-grade boys and four male counselors. But when he arrived at the remote camp with no parents or phone access, B.R. discovered that was false. One of the counselors—who slept in his room and supervised his showering and undressing—was an eighteen-year-old female who had just begun to identify as non-binary (not exclusively male or female).

Although some parents may not object to their children sharing a bed or shower facility with students of the opposite sex, some parents, including Parent Plaintiffs, have religious (and non-religious) objections to such arrangements. And all parents—

religious and non-religious alike—have the fundamental right to protect their children's bodily privacy. So too, all students have the fundamental right to bodily privacy and religious exercise. They have the right to decide whether they will share intimate spaces like bedrooms, beds, and showers with the opposite sex. By conditioning an educational benefit on Plaintiffs' willingness to submit to opposite-sex rooming arrangements, JeffCo violates Plaintiffs' free exercise, bodily privacy, and parental rights.

Parent Plaintiffs raised these concerns with JeffCo. But JeffCo told them it would continue to room students overnight by gender identity without notice or a sex-separated alternative. Then, JeffCo doubled down by removing the language from its policy that suggested sex-separated accommodations could be made for students.

JeffCo can easily notify parents, obtain their consent, and protect their rights. It currently does so for students who identify as transgender, asking those students and their parents whether they want to share overnight accommodations with students of the opposite sex. And JeffCo elicits this information without revealing the private information of any other student. Plaintiffs ask for the same treatment here.

Given JeffCo's policy, Plaintiffs need a preliminary injunction to prevent further irreparable harm. Each family has children in school activities that require overnight travel during the 2024–25 school year. Most pressingly, the Perlman's son, P.P., will attend Outdoor Lab this November 5-8, 2024. The Perlmans expected P.P.'s Outdoor Lab trip to be in May 2025. But the week they filed this suit, they learned that this year Outdoor Lab would be in the fall. On September 12, at the first parent meeting, they learned the dates—November 5-8, 2024.

Thus, Plaintiffs ask for a preliminary injunction on an expedited basis to protect their fundamental rights and stop JeffCo from placing Student Plaintiffs in overnight accommodations with students of the opposite sex.

## STATEMENT OF FACTS

### A.     JeffCo's Overnight Accommodations Policy

JeffCo has arranged and sponsored student overnight travel for decades. Movant's Appx., p. 80 – B.R.'s Decl. And for decades, JeffCo has promised parents that girls and boys would room separately. *Id*. But unbeknownst to many parents, including Parent Plaintiffs, JeffCo's current overnight accommodations policy is based on gender identity rather than sex. Verified Complaint (Compl.) at Ex. A. Under the policy, JeffCo assigns students to share beds, rooms, and shower facilities overnight with members of the opposite sex without notifying parents or providing them an opportunity to choose sex-separated accommodations. Movant's Appx., p. 80 – B.R.'s Decl.

Until recently, Plaintiffs were unaware of JeffCo's policy because it is tucked into District Policy JB R-2, titled "Equal Education Opportunities – Transgender Students." Compl. at Ex. A. They had no reason to think JB R-2 would be relevant to their children because none of their children identify as transgender. Movant's Appx., p. 74 – D.W.'s Decl., p. 82 – B.R.'s Decl. The policy states: "[i]n most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school." Compl. ¶ 208, Ex. A at 3. Despite the policy language, JeffCo does not require students to "consistently assert[]" a gender identity to room with the opposite sex. *Id*. ¶ 214. In practice, students can assert a transgender identity and notify JeffCo right before a trip to secure a room assignment with students of the sex they choose. *Id*.; Movant's Appx., p. 63 – Outdoor Lab Counselor Application.

The policy also says, "under no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own." *Id.* ¶ 209, Ex. A at 3. But as D.W. and B.R. experienced, all other students can be

4

assigned to a room with students of the opposite sex without notice or an opportunity to choose a sex-separate option. *Id.*, p. 71 – D.W.'s Decl.; *Id.*, p. 80 – B.R.'s Decl.

Until recently, the policy said that *any* student "who has a need or desire for increased privacy" "should be provided a reasonable accommodation, which may include a private room." Compl. ¶ 210, Ex. A at 3. But that's not how it worked last year when JeffCo assigned both D.W. and B.R. to room with students of the opposite sex. *Id.* ¶¶ 85–87, 214–215. And after their experiences, when Parent Plaintiffs and other parents asked JeffCo for sex-separated accommodations, JeffCo removed the "reasonable accommodation" language in July 2024, rather than address parents' concerns. *Id.* 210; Movant's Appx., p. 68 – Joseph Wailes Decl., p. 96 – Pre-July 2024 Policy.

### B.    Plaintiffs' upcoming overnight trips

All three Plaintiff families—the Waileses, Rollers, and Perlmans—have children attending school trips in the months ahead. Compl. ¶ 265. Some are imminent, such as the Outdoor Lab starting on November 5, 2024—which the Perlmans' son, P.P., is set to attend. *Id.* ¶ 266. Others will occur throughout the 2024–25 school year. For example, the Perlmans' older daughter, M.P., recently made varsity basketball and will travel overnight with her team. Her travel season is expected to start in the next few months. Movant's Appx., p. 87 – Rob Perlman Decl. The Rollers' daughter, D.R., is on the high school soccer team and participates in HOSA. Compl. ¶ 270. D.R. will have overnight trips for these activities. Movant's Appx., p. 78 – Bret Roller's Decl. Soccer travel typically starts in the spring but may start sooner this year. *Id.* HOSA also has overnight competitions and conferences. *Id.* The Waileses' twins, G.W. and B.W., are registered to attend and currently making payments for the June 2025 trip to D.C. *Id.* p. 68 – Joseph Wailes Decl.; Compl. ¶ 266.

Based on JeffCo's current policy and past practice, there is an imminent threat of the same harm to Plaintiffs' constitutional rights that D.W., B.R., and their parents have already suffered. Because it is JeffCo's policy not to inform students that they will share a room with a student of the opposite sex, the Waileses did not find out that a male student was about to climb into bed with their eleven-year-old daughter, D.W., until she was on the 2023 D.C. trip and getting ready for bed the first night. Compl. ¶¶ 61, 85–88, 92–93, 99–100, 216, 219. When the Waileses signed D.W. up for the 2023 D.C. trip, D.W.'s Principal, who was also the trip leader, told them that male and female students would be roomed on separate floors. *Id.* ¶¶ 58, 222. And that there would be either four female or four male students in each room. *Id.* ¶ 68. JeffCo asked students to request specific roommates. *Id.* ¶ 64. Though D.W. provided the names of three friends, D.W. knew only two of the three roommates the school assigned her. *Id.* ¶¶ 65–66. The four students had to share two beds. *Id.* ¶¶ 65–66. D.W. was to share a bed with the student she did not know. *Id.* ¶ 69.

Only after D.W. and her roommates were getting ready for bed did she learn that the student she did not know was a male who identified as a girl. Compl. ¶¶ 85–86. The student was the one who told her. *Id.* ¶ 85. D.W. was immediately uncomfortable with the prospect of sharing a room and a bed with a male—regardless of the student's gender identity. *Id.* ¶¶ 87–90. She excused herself to the closet, where she hid and called her mom for help. *Id.* ¶¶ 91–92. She then called her dad from the bathroom. *Id.*

This was not an isolated incident. During the 2022–23 school year, the Roller's son, B.R., attended the sixth-grade Outdoor Lab. *Id.* ¶ 144. All sixth graders in JeffCo participate in Outdoor Lab because it is part of the science curriculum. *Id.* ¶¶ 128–130. JeffCo gave the Rollers an informational packet that read: "All 6th grade students enrolled in JeffCo Public Schools are expected to attend Outdoor Lab with their

homeschool peers and teachers" because the "week onsite is immersed in 6th grade curriculum that cannot be replicated in the classroom." *Id.* ¶ 130, Ex. C.

During Outdoor Lab, students stay at a JeffCo-owned mountain campground for four days and three nights. Compl. ¶ 131. No parents can chaperone, attend, or visit during Outdoor Lab. *Id.* ¶¶ 132–133. And students are not allowed to call their parents during camp. *Id.* ¶ 134. Along with permanent JeffCo staff, JeffCo high-school students serve as counselors in cabins with the students. *Id.* ¶¶ 138, 140.

JeffCo told the Rollers and B.R. he would be assigned a cabin with 30 sixth-grade male students and four male counselors. *Id.* ¶¶ 137, 152. Parents and students cannot choose their cabin, roommates, or counselors. *Id.* ¶ 150. And parents are not informed who the counselors will be. *Id.* ¶ 151.

B.R. attended Outdoor Lab from December 13–16, 2022. Compl. ¶ 158. When he arrived and met his counselors, he discovered a problem. One of his counselors was an 18-year-old female. *Id.* ¶ 162. Though this counselor stayed in the male bunkhouse with him, B.R. knew the counselor had identified as a female at a 4H event B.R. had attended the week before and identified as "non-binary" at school. *Id.* ¶¶ 162–167.

B.R. and other sixth-grade boys were mortified at the thought of undressing in front of an eighteen-year-old female. *Id.* ¶¶ 168–169. But B.R. soon discovered that this female counselor would also supervise his showers, with only a small curtain between them that did not fully shield their bodies from view. *Id.* ¶¶ 170–171. JeffCo instructs counselors to stand outside the showers and time the students. *Id.* ¶ 172. B.R. and many other boys refused to shower the entire trip because they were too embarrassed and anxious to shower in front of a teenage girl. *Id.* ¶174. B.R. had no way to call home to tell his parents, but when Mrs. Roller picked B.R. up after Outdoor Lab, it was the first thing B.R. said. Compl. ¶ 160. He immediately told her about his counselor and how he

felt uncomfortable having a female counselor sleep in his room and monitor his showers. *Id.* ¶¶ 160, 174.

      **C.**    **JeffCo refuses to address Plaintiffs' concerns.**

After D.W.'s experience on the D.C. trip, the Waileses contacted JeffCo with their concerns. Compl. ¶ 220. They first asked JeffCo to be honest about how it rooms students before the trips. *Id.* ¶ 221. Because JeffCo had not provided the Waileses with all the relevant information about who would be assigned to their daughter's room, they could not make an informed decision about whether D.W. should attend or seek alternative sleeping arrangements. *Id.* ¶¶ 222, 238. During the trip, the chaperones found a way for D.W. not to sleep with the male student. But they did so only after D.W. insisted on a bed with a female student, and only after Mrs. Wailes, who happened to be on the trip, intervened. *Id.* ¶¶ 92–118.

Later, when the Waileses told JeffCo that D.W.'s younger siblings were signed up for the same D.C. trip at the end of the 2024–25 school year, *id.* ¶ 249, they asked for an arrangement to ensure their twins would be roomed by sex—not gender identity. Compl. ¶¶ 239–243. Just as the male student with the female identity whom JeffCo placed in D.W.'s room could choose to stay with female students rather than male students, *id.* ¶ 274, the Waileses asked to choose whether their children would room with students of the opposite sex. The Waileses encouraged JeffCo to be upfront with parents and ask whether they want their child to be roomed by gender identity rather than sex. *Id.* ¶¶ 239–243. Such a practice would protect the privacy of *all* children. *Id.*

But JeffCo refused. *Id.* ¶¶ 244, 275. JeffCo's response to the Waileses confirmed JeffCo will (1) continue to assign all students based on gender identity, not sex, and (2) refuse to inform parents before a trip if a student or counselor of the opposite sex who identifies as transgender will be assigned to share a bed, room, or

shower facility with their child. *Id.* ¶ 273. If staying in the same room with a student of the opposite sex violates the beliefs or privacy of another student, JeffCo's only solution is for that student to miss an important extracurricular activity, like the D.C. trip, or worse, not complete a required part of the curriculum, like Outdoor Lab. *Id.* ¶¶ 279–281.

Following B.R.'s distressing experience at Outdoor Lab, the Rollers also spoke with a JeffCo administrator about the policy. *Id.* ¶¶ 252–253. The administrator informed Mrs. Roller that the policy required JeffCo to room the eighteen-year-old female with her eleven-year-old son. *Id.* ¶¶ 234–254. The administrator also confirmed that the policy's purpose was exclusively focused on students who identify as transgender, and JeffCo would not provide her children with any alternative for future trips. *Id.* ¶¶ 253, 257–258.

After receiving these requests from the Waileses, Rollers, and other concerned parents, JeffCo made things even worse by amending its policy to remove the only language suggesting an accommodation. Compl. ¶ 210; Movant's Appx., p. 68 – Joseph Wailes Decl., p. 96 – Pre-July 2024 Policy. So, moving forward, JeffCo will continue to keep parents in the dark and not accommodate students who object to sharing a bed, shower, or room with a student of the opposite sex.

Because of JeffCo's actions, Plaintiffs need a preliminary injunction to protect their fundamental rights and stop JeffCo from assigning students of the opposite sex to their children's beds, bedrooms, and shower facilities on trips without their consent.

## LEGAL STANDARD

To secure a preliminary injunction, Plaintiffs must show: (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the alleged harm outweighs any harm to the nonmoving party; and (4) the injunction will be in the public interest. *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1128 (10th Cir. 2013), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014). The likelihood

of success factor is usually "determinative" when a preliminary injunction is needed to protect the exercise of a constitutional right, *Sebelius*, 723 F.3d at 1145, because:

- the loss of a constitutional right—even for a short time—constitutes irreparable harm, *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1190 (10th Cir. 2003);

- the government's interest in the enforcement of a likely unconstitutional policy does not outweigh a party's interest in having their "constitu-tional rights protected," *Awad v. Ziriax*, 670 F.3d 1111, 1131–32 (10th Cir. 2012); and

- "it is always in the public interest to prevent the violation of a party's constitutional rights," *id.* at 1132 (citation omitted).

Plaintiffs' likelihood of success on the merits is determinative here.

## ARGUMENT

### I.    Plaintiffs are likely to succeed on the merits of their claims.

Plaintiffs are likely to succeed on the merits because JeffCo's policy (A) burdens their religious exercise, (B) violates Student Plaintiffs' bodily privacy rights, and (C) infringes Parent Plaintiffs' right to direct their children's care, upbringing, and education. Any of these infringements trigger strict scrutiny—which the policy cannot survive.

### A.  JeffCo's policy violates Plaintiffs' religious exercise.

The First Amendment, incorporated against the States by the Fourteenth Amendment, bars the government from "prohibiting the free exercise [of religion]." U.S. Const. amend. I; amend. XIV. The Free Exercise Clause protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through 'the performance of (or abstention from) physical acts.'" *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 524 (2022) (quoting *Emp. Div., Dep't of Hum. Res. of Or. v. Smith*, 494 U.S. 872, 877 (1990)). For Parent Plaintiffs' this free exercise right also includes the

right to raise their children according to their religious beliefs, including their beliefs about the immutability of sex, bodily privacy, interactions with the opposite sex, and sexual modesty. *E.g.*, *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 486 (2020); *Wisconsin v. Yoder*, 406 U.S. 205, 213–14 (1972); *Pierce v. Soc'y of Sisters*, 268 U.S. 510, 534–35 (1925).

Parent Plaintiffs have sincerely held religious beliefs about sex, gender, bodily privacy, and modesty, that prevent their children from sharing a room, bed, or shower facility with unrelated members of the opposite sex. Movant's Appx., p. 66 – Joseph Wailes Decl., p. 77 – Bret Roller Decl., p. 92 – Jade Perlman's Decl. As parents, they have a religious duty to protect their children's bodily privacy, to teach their children their beliefs on sex, gender, and modesty, and to instruct their children to act consistent with those religious beliefs. *Id.* So they teach their children not to undress, use the restroom or shower, or share overnight accommodations with the opposite sex. *Id.*

Student Plaintiffs share their parent's religious beliefs about sex, gender, bodily privacy, and modesty. They object to undressing, using the restroom, sleeping in a bed, showering, or sharing overnight accommodations with the opposite sex because doing so would force them to act in conflict with their faith. *Id.* at p. 74 – D.W.'s Decl., p. 82 – B.R.'s Decl.

All Plaintiffs also believe that God created people in His image as male and female, and they believe a person's sex is binary and fixed at conception. *Id.* at p. 66 – Joseph Wailes Decl., p. 74 – D.W.'s Decl., p. 77 – Bret Roller Decl., p. 82 – B.R.'s Decl., p. 92 – Jade Perlman's Decl. Because Plaintiffs do not believe people can change their sex, it violates their beliefs for Student Plaintiffs to room with a student of the opposite sex regardless of that student's asserted gender identity. *Id.*, Compl. ¶ 349.

JeffCo's policy burdens Plaintiffs' religious exercise by requiring Student Plaintiffs to share a bed, room, or showering facility with a student or counselor of the opposite sex. It burdens their religious exercise because it stops them from living consistent with their beliefs about bodily privacy, parenting, and the immutability of sex. For Student Plaintiffs, it forces them to act in a way that conflicts with their faith and parents' instruction. For Parent Plaintiffs, it also strips their decision-making authority and prevents them from protecting their children's bodily privacy as their beliefs require. Worse still, the policy conditions access to educational opportunities and curricular requirements on Plaintiffs' willingness to abandon and violate their religious beliefs.

Because of this, JeffCo's policy is subject to strict scrutiny for three reasons. First, it penalizes Plaintiffs' religious exercise by preventing Student Plaintiffs from enjoying the benefits of extra-curricular and curricular activities that require overnight trips. *Carson v. Makin*, 596 U.S. 767, 778–79 (2022). Second, it is not neutral or generally applicable because it provides preferential treatment for students who identify as transgender and does so on a case-by-case basis. *Kennedy*, 597 U.S. at 526. Third, it infringes Plaintiffs' hybrid rights. *Smith*, 494 U.S. at 881 (reading *Yoder* as holding that even "a neutral, generally applicable law" receives strict scrutiny when it burdens religious exercise and "the right of parents. . . to direct the education of their children").

### *i. JeffCo's policy penalizes Plaintiffs' religious exercise.*

The Free Exercise Clause "protects against indirect coercion or penalties on the free exercise of religion, not just outright prohibitions." *Carson*, 596 U.S. at 778 (citation omitted). JeffCo cannot "exclude[] religious observers from otherwise available public benefits" just because they are religious or do religious things. *Id*.

But JeffCo only gives Plaintiffs two options—keep Student Plaintiffs out of activities that require overnight stays *or* let JeffCo decide whether they share beds,

rooms, and showers with the opposite sex for those trips. If Plaintiffs choose the first option, their "freedom [of religion] comes at the cost of automatic and absolute exclusion from the benefits of a public program for which the [families are] otherwise fully qualified." *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 462 (2017). If they choose the second, they violate their religious beliefs. By forcing them to decide between their religious convictions on one hand and educational opportunities on the other, JeffCo "penalizes the free exercise of religion" and engages in religious discrimination "odious to our Constitution." *Carson*, 596 U.S. at 779–80 (cleaned up).[1]

### ii.    *JeffCo's policy is not neutral or generally applicable.*

A government policy is not neutral or generally applicable if it "prohibits religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way or if it provides a mechanism for individualized exemptions." *Kennedy*, 597 U.S. at 526 (cleaned up). JeffCo's policy does both.

### a.    *JeffCo's policy allows secular accommodations for students who identify as transgender but no accommodations, including religious accommodations, for others.*

The policy provides preferential treatment to students who identify as transgender. It states that "under no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own." Compl. ¶ 209, Ex. A at 3. So JeffCo asks students who identify as transgender, and

---

[1] This is similar to the unconstitutional conditions doctrine, which says that even if a person is not entitled to a benefit, the government "may not deny [it] to [him] on a basis that infringes his constitutionally protected interests." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). "For if the government could deny a benefit to a person because of his constitutionally protected [rights], his exercise of those freedoms would in effect be penalized," which "allow[s] the government to 'produce a result which it could not command directly.'" *Id.* (quoting *Speiser v. Randall*, 357 U.S. 513, 526 (1958)).

their parents, whether they want to share a room with students of the opposite sex. *Id.* ¶¶ 211, 274. This means JeffCo lets transgender students choose the sex of their roommates. And JeffCo does this without revealing any students' personal information. Yet there is no reciprocal policy protecting students like Student Plaintiffs, who, for religious reasons, do not want to share a room with students whose *sex* "conflicts with their own." *Id.* As D.W. and B.R. experienced, all non-transgender students can be assigned to a room with a student of the opposite sex without notice or an opportunity to secure a sex-separated option before the trip—even if they have a religious objection to such a rooming assignment. Movant's Appx., p. 74–75 – D.W.'s Decl., p. 82 – B.R.'s Decl.

That policy violates the Free Exercise Clause because it is neither neutral nor generally applicable. A law is not generally applicable if it "prohibits religious conduct while permitting secular conduct" that undermines the same purpose. *Fulton v. City of Phila.*, 593 U.S. 522, 534 (2021). Here, JeffCo says that it wants to ensure equal educational opportunities for all students. But JeffCo forces religious students to choose between their beliefs and educational opportunities, which denies them equal access— all while JeffCo asks students who identify as transgender to choose the sex of their roommates.[2] "It is difficult to see how affording extra privileges to the transgender student based on subjective feelings of discomfort while simultaneously excluding the non-transgender student for similarly subjective feelings is something other than invidious discrimination." *Carroll Indep. Sch. Dist. v. U.S. Dep't of Educ.*, No. 4:24-cv-00461, 2024 WL 3381901, *4 (N.D. Tex. July 11, 2024). "The Free Exercise Clause

---

[2] JeffCo also suggested in a recent FAQ document that students can be exempted from the policy for safety concerns—yet another secular exception. Movant's Appx., p. 64 – Outdoor Lab FAQ Page.

protects religious observers against [such] unequal treatment." *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 542 (1993) (cleaned up).

> ### b.  *JeffCo's policy creates a system of individualized assessments.*

JeffCo's policy also creates a system of individualized assessments for rooming assignments. *Axson-Flynn v. Johnson*, 356 F.3d 1277, 1297 (10th Cir. 2004). Under the policy, JeffCo decides on a individualized basis whether to room each student who identifies as transgender with students of the same or opposite sex based on what the transgender student prefers. Compl. ¶¶ 208–209, 211, 254, 274. A policy that allows the government to consider the particular reasons for allowing certain individuals to room with one sex or the other has all the hallmarks of what *Lukumi*, 508 U.S. at 522*,* and *Fulton*, 593 U.S. at 533, described as a system of individualized assessments. When such a system exists, the government "may not refuse to extend that system to cases of 'religious hardship' without compelling reason." *Lukumi*, 508 U.S. at 537 (quoting *Smith*, 494 U.S. at 884). Yet that is what JeffCo does here.

In the Rollers' case, JeffCo placed a female student who identified as "non-binary" in their son's male-only cabin to serve as the counselor. Under the policy, JeffCo made an individualized assessment in consultation with this student to decide whether the student would be placed in a male or female cabin. Similarly, JeffCo made an individualized assessment with the male student placed in D.W.'s hotel room. JeffCo allowed the student to register for the trip as a "female" and room with female roommates based on the student's asserted identity.

But when the Waileses and Rollers asked that their children be roomed only with students of the same sex because of their religious beliefs, JeffCo refused to provide an accommodation similar to what they granted B.R.'s counselor and D.W.'s roommate.

15

Compl. ¶¶ 244, 254, 260. Because JeffCo "may not refuse to extend that system [of exemptions] to cases of 'religious hardship' without compelling reason," *Fulton*, 593 U.S. at 534 (citation omitted), the policy triggers (and fails) strict scrutiny.

### iii.   JeffCo's policy burdens hybrid rights.

JeffCo's policy is also subject to strict scrutiny because it burdens Plaintiffs' hybrid rights. *Smith*, 494 U.S. at 881. *Smith* interpreted *Yoder* to hold that strict scrutiny applies when a free exercise claim is coupled with another constitutional claim—such as the parental rights claim discussed below. *Axson-Flynn*, 356 F.3d at 1295. The plaintiff must show the companion constitutional claim is "colorable," meaning it has a "fair probability or likelihood, but not a certitude, of success on the merits." *Id.* at 1297.

Because, as discussed below, Plaintiffs have a colorable parental rights claim with their free exercise claim, JeffCo's policy is subject to strict scrutiny.

### B.  JeffCo's policy violates Plaintiff Students' right to bodily privacy.

"There is a constitutional right to privacy." *Cumbey v. Meachum*, 684 F.2d 712, 714 (10th Cir. 1982). Indeed, "[i]n a civilized society, one's anatomy is draped with constitutional protections." *Shroff v. Spellman*, 604 F.3d 1179, 1191 (10th Cir. 2010) (citation omitted). And one "cannot conceive of a more basic subject of privacy than the naked body. The desire to shield one's unclothed figure from view of strangers, and particularly strangers of the opposite sex, is impelled by elementary self-respect and personal dignity." *Poe v. Leonard*, 282 F.3d 123, 138 (2d Cir. 2002) (quoting *York v. Story*, 324 F.2d 450, 455 (9th Cir. 1963)).

Everyone has a "constitutionally protected privacy interest in his or her partially clothed body." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 175–76 & n.5 (3rd Cir. 2011); *accord Canedy v. Boardman*, 16 F.3d 183, 185 (7th Cir. 1994) (affirming the "right to

16

privacy is now firmly ensconced among the individual liberties protected by our Constitution"). This "reasonable expectation of privacy" exists "particularly while in the presence of members of the *opposite sex*." *Luzerne Cnty.*, 660 F.3d at 177 (emphasis added). That is because "[t]he two sexes are not fungible; a community made up exclusively of one [sex] is different from a community composed of both." *United States v. Virginia,* 518 U.S. 515, 533 (1996) (quoting *Ballard v. United States,* 329 U.S. 187, 193 (1946)); *see also Michenfelder v. Sumner*, 860 F.2d 328, 333 (9th Cir. 1988) ("[s]hielding one's unclothed figure from the view of strangers, particularly strangers of the opposite sex is impelled by elementary self-respect and personal dignity").

JeffCo's insistence on conditioning educational opportunities and access to curricular requirements upon a child's willingness to surrender their fundamental right to privacy is a radical departure from this Nation's history and tradition. Historically, there has been "undisputed approval of separate public restrooms for men and women based on privacy concerns. The need for privacy justifies separation." *Faulkner v. Jones*, 10 F.3d 226, 232 (4th Cir. 1993). When women began working in factories, the law began mandating sex-specific facilities. Massachusetts adopted the first such law in 1887. *See* Act of Mar. 24, 1887, ch. 103, § 2, 1887 Mass Acts, 668, 669.

Later, when public buildings began offering multi-toilet restrooms, they designated one for men and one for women. This became an American norm based on the real and relevant differences between the sexes. Females "using a women's restroom expect[] a certain degree of privacy from . . . members of the opposite sex." *State v. Lawson*, 340 P.3d 979, 982 (Wash. App. 2014).

This right is particularly important for adolescents. Teenagers are "embarrass[ed] . . . when a member of the opposite sex intrudes upon them in the lavatory." *St. John's Home for Children v. W. Va. Hum. Rts. Comm'n*, 375 S.E.2d 769, 771 (W. Va. 1988).

And children "have a significant privacy interest in their unclothed bodies" during school-sponsored trips. *Beard v. Whitmore Lake Sch. Dist.*, 402 F.3d 598, 604 (6th Cir. 2005). This right is implicated *anytime* the government forces one to undress, but "it is generally considered a greater invasion to have one's naked body viewed by a member of the opposite sex." *Canedy*, 16 F.3d at 185.

"[P]rivacy matters" to children and is "central to their development and integrity." Samuel T. Summers, Jr., *Keeping Vermont's Public Libraries Safe*, 34 Vt. L. Rev. 655, 674 (2010) (quoting Ferdinand Schoeman, *Adolescent Confidentiality and Family Privacy*, in Person To Person 213, 224 (George Graham & Hugh Lafollette eds., 1989)). Forcing Student Plaintiffs to share overnight rooms, beds, and shower facilities—where they have the greatest expectation of privacy—with opposite-sex students risks their "permanent emotional impairment" under the mere "guise of equality." *City of Phila. v. Pa. Hum. Relations Comm'n*, 300 A.2d 97, 103 (Pa. Commw. Ct. 1973).

Schools have long claimed an interest in providing their students with "sex-segregated spaces based on biological. . . sex" that allow them to protect their privacy while engaging in certain private acts "consistent with society's long-held tradition of performing such functions in sex-segregated spaces." *Johnston v. Univ. of Pittsburgh*, 97 F. Supp. 3d 657, 668 (W.D. Pa 2015). This is especially true in a public school "whose mission is primarily pedagogical, but which is also tasked with providing safe and appropriate facilities for all of its students," particularly when providing overnight accommodations for students on school-sponsored trips. *Id.*

The harm to female student is often more acute. "[T]he presence of unrelated males in [areas] where intimate bodily functions take place is a cause of stress to females." *Torres v. Wis. Dep't of Health & Soc. Servs.*, 859 F.2d 1523, 1531 (7th Cir. 1988) (citation omitted). This is because of the "real . . . differences between men and

women." *Id.* at 1527. JeffCo's Policy does not respect bodily privacy. Rather, it demeans Student Plaintiffs, forcing them to sleep in the same bed or room, use restrooms, address hygiene needs, shower, and change their clothes in the presence of the opposite sex. JeffCo's policy tramples dignity interests, strips away modesty and privacy, and leaves children humiliated and vulnerable in intimate spaces where they should feel protected. Because the policy infringes the fundamental right to bodily privacy and minors' right to be free from state-compelled exposure to the opposite sex, it is unconstitutional unless it can survive strict scrutiny. *Reno v. Flores*, 507 U.S. 292, 301–02 (1993).

### C. JeffCo's policy violates Parent Plaintiffs' fundamental right to direct their children's religious upbringing and protect their bodily privacy.

The Fourteenth Amendment "provides heightened protection against government interference with certain fundamental rights and liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality op.) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997)); *see* U.S. Const. amend. XIV, § 1. It protects fundamental rights that are "objectively, deeply rooted in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 239 (2022) (quoting *Glucksberg*, 521 U.S. at 720-21). And it "forbids the government to infringe fundamental liberty interests at all, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest." *Glucksberg*, 521 U.S. at 721 (cleaned up).

The Supreme Court has held for over a century that among the rights protected by the Fourteenth Amendment is the right "to direct the education and upbringing of one's children." *Id.* at 720; *see Meyer v. Nebraska*, 262 U.S. 390, 399 (1923); *Pierce*, 268 U.S. at 534-35. It "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel*, 530 U.S. at 65.

Since 1923, the Court has looked to the common-law to interpret parental rights, which establish the deep historical roots of parents' plenary decision-making authority over the care and education of their children. *Meyer,* 262 U.S. at 399; *Parham v. J.R.*, 442 U.S. 584, 602 (1979) (citing Blackstone and Kent).

Because children lack the "maturity, experience, and capacity for judgment required for making life's difficult decisions," our legal tradition vests parents with the right and authority to make decisions in the best interests of their children. *Parham*, 442 U.S. at 602 (parents possess the "natural bonds of affection" that lead them "to act in the best interests of their children"). Parents are better positioned than their children to make decisions in difficult situations like those D.W. and B.R. faced.

Courts recognize parents' deeply rooted decision-making authority in many contexts. For example, parents decide what subjects their children will study, *Meyer*, 262 U.S. at 402–03, and what school their children will attend, *Pierce,* 268 U.S. at 534–35. Parents have the right to make healthcare decisions for their children, *Parham*, 442 U.S. at 603, and to determine their children's custody and visitation time. *Troxel*, 530 U.S. at 65–67. As to a child's bodily privacy, schools cannot unilaterally force a student to take a pregnancy test, *Gruenke v. Seip*, 225 F.3d 290, 305 (3d Cir. 2000); get an abortion, *Arnold v. Bd. of Educ. of Escambia Cnty.*, 880 F.2d 305, 312–14 (11th Cir. 1989*), overruled on other grounds by Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163 (1993); or answer surveys about race, religion, drug use, sexual activity, or other personal matters, *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 184 (3d Cir. 2005); *Merriken v. Cressman*, 364 F. Supp. 913, 915-16, 921 (E.D. Pa. 1973), without infringing their parents' right to direct their upbringing.

Given the broad scope of parental rights, "[i]t is not unforeseeable. . . that a school's policies might come into conflict with the fundamental right of parents to raise

and nurture their child." *Gruenke*, 225 F.3d at 305. And "when such collisions occur, the primacy of the parents' authority must be recognized and should yield only where the school's action is tied to a compelling interest." *Id.*; *see also Mirabelli v. Olson*, 691 F. Supp. 3d 1197, 1210-12 (S.D. Cal. 2023) (detailing history of parental rights cases).

In fact, JeffCo recognizes parents' broad decision-making authority in other aspects of student life. For example, JeffCo seeks parental consent for field trips or to give a student Tylenol. Movant's Appx., p. 67 – Joseph Wailes Decl. Yet JeffCo refuses to seek consent in a much more important context before placing that same child in a room, bed, or shower with the opposite sex on school trips. *Id.*

This "strike[s] at the heart of parental decision-making authority on matters of the greatest importance," *C.N.*, 430 F.3d at 184. It violates Parent Plaintiffs' authority to (1) direct their children's religious upbringing and (2) protect their child's bodily privacy. Indeed, compelling Parent Plaintiffs to allow their children to room overnight with the opposite sex in conflict with their religious beliefs violates their parental right to direct their children's religious upbringing. *See* Section I.A. And by placing their children in bedrooms and shower facilities with the opposite sex *without* informing Parent Plaintiffs or providing them a private or sex-separated alternative, JeffCo has usurped Parent Plaintiffs' right to protect their children's bodily privacy. So it is subject to strict scrutiny. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396, 419 (6th Cir. 2019).

JeffCo's disregard of Parent Plaintiffs' rights is particularly egregious because its policy doesn't even notify parents that their children will be rooming with, or supervised in the shower by, a person of the opposite sex. Accurate information is a precondition of parents' ability to exercise their parental rights. They can't "make decisions concerning the care, custody, and control of their children" when the government conceals information about their children's lives. *Troxel*, 530 U.S. at 66 (plurality op.); *see also*

*Ricard v. USD 475 Geary Cnty. Sch. Bd.*, No. 5:22-cv-04015, 2022 WL 1471372, at *8 (D. Kan. May 9, 2022) ("It is difficult to envision why a school would even claim—much less how a school could establish—a generalized interest in withholding or concealing from the parents of minor children, information fundamental to a child's identity, personhood, and mental and emotional well-being ...."); *Mirabelli*, 691 F. Supp. 3d at 1212 ("[The school's] policy of . . . excluding a parent from knowing of, or participating in, that kind of choice, is . . . foreign to federal constitutional and statutory law. . . .").

Notably, JeffCo can notify parents and obtain their consent without identifying any student. They currently do so for students who identify as transgender, asking those students whether they are comfortable sharing overnight accommodations with students of the opposite sex. And JeffCo does this without divulging the private information of any other student. Plaintiffs seek the same treatment.

The Waileses situation illustrates the importance of information. They were explicitly told by a JeffCo administrator that their daughter would be roomed with three female students on a floor with only female students. JeffCo could have informed parents at either parent meeting or in the thirty pages of documents sent home to parents that they were rooming students based on "gender identity" rather than sex. That information would have allowed parents to make informed decisions. Instead, JeffCo concealed it. And when the Waileses asked JeffCo to inform parents of their rooming policy before upcoming trips, JeffCo refused. Compl. ¶ 244.

Addressing opposite-sex rooming ahead of a trip protects all children—including those who identify as transgender. It allows adults to address concerns before children are put in uncomfortable situations while protecting the identity of any student who identifies as transgender. Instead, because Jeffco left the Wailes out of the decision, the

children were forced to deal with a difficult situation that the adults could have resolved before the trip.

JeffCo cannot force these Plaintiffs to let their children share overnight accommodations with students of the opposite sex without strict scrutiny.

**D.      JeffCo's policy fails strict scrutiny.**

Because JeffCo's policy violates Plaintiffs' constitutional rights, it must survive strict scrutiny. *Kanuszewski*, 927 F.3d at 419; *Fulton*, 593 U.S. at 541. JeffCo must prove that applying its policy to Plaintiffs "furthers a compelling governmental interest and is narrowly tailored to that end." *Reed v. Town of Gilbert*, 576 U.S. 155, 171 (2015). JeffCo cannot meet that burden.

> **i.      JeffCo lacks a compelling interest to justify the constitutional harms.**

JeffCo has no compelling governmental interest in forcing Student Plaintiffs to share a bed, room, or shower with a student of the opposite sex, much less in doing so without parental consent or notice—especially when JeffCo allows parents of students who identify as transgender to decide whether their children will room with students of the opposite sex. *Fulton*, 593 U.S. at 541–42 (asking "not whether [the government] has a compelling interest in enforcing its non-discrimination policies generally, but whether it has such an interest in denying an exception to [the plaintiff]"); *Lukumi*, 508 U.S. at 547 (explaining that an interest is not "of the highest order" when the state inconsistently pursues it). Allowing all parents to make these decisions with their children and giving them the information they need to do so ensures that *all* children's rights are protected.

> **ii.      JeffCo's policy is not narrowly tailored.**

JeffCo's policy is also not narrowly tailored. For families whose children do not identify as transgender, JeffCo provides no reasonable accommodations. JeffCo

removed the only provision in the policy under which a student who does not identify as transgender could request an accommodation. Movant's Appx., p. 68 – Joseph Wailes Decl. When the Waileses asked JeffCo for an accommodation for their twins to go on the D.C. trip, JeffCo's only answer was that they could request specific roommates. But D.W. requested specific roommates, and JeffCo still assigned her to a room with a student of the opposite sex. *Id.* p. 70 – D.W.'s Decl. That suggestion clearly doesn't work.

The existence of readily available, least restrictive options proves that a policy is not narrowly tailored. *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 823 (2000). Accommodating Plaintiffs would not be difficult and would still protect the interests of all students. Indeed, JeffCo could easily account for the interests of students who identify as transgender while accommodating Plaintiffs. For example, JeffCo could let all parents choose whether their children will be roomed by gender identity or sex or assert that they have no preference. Then JeffCo could make the rooming arrangements without any parents or students knowing which students identify as transgender. In fact, this process would more effectively further JeffCo's interests because settling these matters *before* the trip would avoid the uncomfortable on-the-spot situation experienced by D.W. and the transgender student assigned to her room. And given that a small number of students identify as the opposite sex, and that many parents do not object to their children rooming based on gender identity, accommodating Plaintiffs' desire to room with students of the same sex will be easy to arrange.

That there are other "less restrictive alternative[s]" to accommodate the privacy interests and religious convictions of *all* parents and students proves that JeffCo's policy is not narrowly tailored. *Playboy Ent. Grp.*, 529 U.S. at 823. Since JeffCo lacks a

compelling interest to enforce its policy against Plaintiffs and has failed to narrowly tailor its policy, its policy fails strict scrutiny.

## II. Plaintiffs' likelihood of success on any of their constitutional claims is determinative of the remaining factors.

Because Plaintiffs are likely to prevail on the merits, the three remaining factors also weigh in their favor. The loss of any of Plaintiffs' constitutional rights—even for a short time—is irreparable harm. *Heideman*, 348 F.3d at 1190. JeffCo's interest in enforcing its policy does not outweigh Plaintiffs' interest in having their "constitutional rights protected." *Awad*, 670 F.3d at 1131–32. And "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id.* at 1132 (citation omitted).

## CONCLUSION

Parents have a fundamental right to protect their children's privacy and make important decisions concerning their care. That right is violated when a school district requires their child to share a bed, room, or shower facility with a student of the opposite sex without their consent. Nor should any children be excluded from educational opportunities or curricular requirements because they or their parents—for personal or religious reasons—do not want to share a bed or shower facility with the opposite sex. But that is what JeffCo's policy does. And it threatens to harm Plaintiffs as soon November 5. That is why a preliminary injunction is needed.

Respectfully submitted this 30 day of September, 2024.

s/ Katherine L. Anderson

    Katherine L. Anderson
    AZ Bar No. 33104
    ALLIANCE DEFENDING FREEDOM
    15100 N. 90th Street
    Scottsdale, Arizona 85260
    (480) 444-0020
    kanderson@ADFlegal.org

    David A. Cortman
    GA Bar No. 188810
    ALLIANCE DEFENDING FREEDOM
    1000 Hurricane Shoals Road N.E.,
      Suite D1100
    Lawrenceville, Georgia 30043
    (770) 339-0774
    dcortman@ADFlegal.org

Noel W. Sterett
IL Bar No. 6292008
Mallory B. Sleight
NE Bar No. 27129
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
nsterett@ADFlegal.org
msleight@ADFlegal.org

*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 30, 2024, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system which will send notification of such filing to the following counsel of record who are registered users of the ECF system:

Eric R. Olson
Isabel Broer
OLSON GRIMSLEY KAWANABE HINCHCLIFF &
MURRAY LLC
700 17th Street, Suite 1600
Denver, CO 80202

s/ Katherine L. Anderson

Katherine L. Anderson
AZ Bar No. 33104
ALLIANCE DEFENDING FREEDOM
15100 N. 90th Street
Scottsdale, Arizona 85260
(480) 444-0020
kanderson@ADFlegal.org

*Attorney for Plaintiff*