### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLORADO
### Judge Regina M. Rodriguez

Civil Action No. 1:24-cv-02439-RMR-NRN

JOSEPH and SERENA WAILES, et al.,

      Plaintiffs,

v.

JEFFERSON COUNTY PUBLIC SCHOOLS and
JEFFERSON COUNTY PUBLIC SCHOOLS
BOARD OF EDUCATION,

      Defendants.

---

### ORDER

---

      This matter is before the Court on Plaintiffs' Motion for Preliminary Injunction, ECF No. 15. The Motion is fully briefed and ripe for review. For the reasons set forth below, the Motion is DENIED.[1]

### I.     BACKGROUND[2]

      It is axiomatic that, in the public school system, parents will not always agree with the policies and decisions made by public schools as it relates to their children's

---

[1] The Court does not find that an evidentiary hearing is necessary before ruling on the Motion for Preliminary Injunction. *See Reynolds & Reynolds Co. v. Eaves*, 149 F.3d 1191, 1998 WL 339465, at *3 (10th Cir.1998) ("[Plaintiff] has failed to cite any Tenth Circuit authority that requires a district court to hold an evidentiary hearing prior to granting or denying a preliminary injunction motion . . . . Accordingly, we do not instruct the district court to hold an evidentiary hearing prior to disposition of [Plaintiff's] motion, although the district court is free to do so within its own discretion."). Here, given the nearly 200 pages of evidence submitted by the parties with their briefing and the need for an expedited ruling, the Court exercises its discretion to rule on the Motion without holding an evidentiary hearing.

[2] The background is taken from parties' briefing and appendixes. ECF Nos. 15, 15-1, 25, 25-1, 29, 32.

education. Conflicts may arise where parents perceive a school's policy or decision as negatively impacting or otherwise harming their children's education or rights. At the outset, the Court acknowledges the importance of addressing these types of disputes in a manner that recognizes the parents' sincere and natural desire to protect their children and the public school's obligation to provide a free and fair education while protecting the rights of all students.

In the instant case, Plaintiffs—Jefferson County ("Jeffco") parents and students—take issue with Jeffco's policy regarding how students are roomed on school-sponsored overnight trips. Specifically, Plaintiffs argue that Jeffco's policy, which permits transgender students to be roomed by gender identity rather than their sex assigned at birth, violates Plaintiffs' constitutional rights "to free exercise, to bodily privacy, and to direct the care of their children." ECF No. 15 at 1. Because the next school-sponsored overnight trip is fast approaching, Plaintiffs have moved for an order "preliminarily enjoin[ing] JeffCo from assigning Student Plaintiffs to beds, bedrooms, and shower facilities with students of the opposite sex during any school-sponsored overnight trips." ECF No. 15 at 1. Plaintiffs specifically represent that this narrow request "does not ask this Court to order [Jeffco] to change their district-wide policy . . . . " ECF No. 21 at 1 (internal quotation marks omitted). Jeffco responds that its existing policies attempt to address the needs of all students in accordance with state and federal law, and that Plaintiffs' requested relief is unwarranted because accommodations for Student Plaintiffs are available. ECF No. 25.

### A.     Jeffco Policy

The policy at issue is District Policy JB R-2, titled "Equal Education Opportunities – Transgender Students." ECF No. 15-1, Movant's App'x ("MA") at 94. The policy states: "Colorado law and District policy require that all programs, activities, and employment practices are free from discrimination based on sex, sexual orientation, and gender identity and expression." *Id.* In line with these requirements, the policy's stated purpose "is to foster an educational environment that is safe and free from discrimination for all students, regardless of sexual orientation, gender identity or expression. The guidelines are for ensuring and facilitating compliance with local, state and federal laws concerning harassment and discrimination." *Id.*

As relevant here, the policy includes guidelines for overnight activity. *Id.* at 95-96. With respect to overnight trips, the policy provides:

> In the planning of sleeping arrangements during overnight activity and athletic trips, the needs of students who are transgender shall be assessed on a case-by-case basis with the goals of maximizing the student's social integration, providing equal opportunity to participate in overnight activity and athletic trips, ensuring the student's safety and comfort, and minimizing stigmatization of the student. In most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school. Any student who is transgender or not, who has a need or desire for increased privacy, regardless of the underlying reason, should be provided with a reasonable accommodation, which may include a private room. Any alternative arrangement should be provided in a way that allows the student's transgender status to be kept confidential. Under no circumstance shall a student who is transgender be required to share a room with students whose gender identity conflicts with their own.

*Id.* at 96 (emphasis added). Plaintiffs allege—and Jeffco does not dispute—that the underlined language has since been removed from the policy. ECF No. 1 ¶ 210.

To enroll in Jeffco schools, families must provide documentation of the student's identity, such as a birth certificate or state-issued ID card. JEFFCO PUBLIC SCHOOLS, Enroll, https://www.jeffcopublicschools.org/enroll (last visited Oct. 24, 2024). Jeffco uses that documentation to mark the student's "legal gender" in their official records. ECF No. 25 at 3. Jeffco keeps these student records in a system called Infinite Campus. *Id.* at 3 n.1. Jeffco represents that "[a] student's legal name and legal gender are only visible to a small number of high-level Jeffco employees, like district administrators. They are *not* visible to school administrators or teachers." *Id.* (emphasis in original). And the legal gender recorded in Infinite Campus does not necessarily reflect the student's sex assigned at birth, because state law allows an individual (or a minor's parents or guardians) to change the sex designation on their birth certificate. C.R.S. § 25-2-113.8. Thus, Jeffco has no way of knowing the sex assigned at birth of a student whose legal gender has been changed by statute.

### B.    Upcoming Trips

Plaintiffs allege a preliminary injunction is necessary to prevent Student Plaintiffs from sharing rooms, beds, or shower facilities with students of the opposite sex assigned at birth. The alleged upcoming trips include: (1) P.P.'s Outdoor Lab trip, scheduled for November 5-8, 2024, ECF No. 25-1, Respondents' App'x ("RA") at 7, 10; (2) G.W. and B.W.'s trip to Washington, D.C., Philadelphia, and New York, scheduled for June 2025, MA at 68 ¶ 24; and (3) unplanned but anticipated soccer and basketball trips and other school club-related trips.

## II.      LEGAL STANDARD

### A.      Preliminary Injunction

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020) (quoting *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d 886, 888 (10th Cir. 1989)). To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harms that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *Id.* (quoting *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007)); *accord Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "The third and fourth factors 'merge' when, like here, the government is the opposing party." *Aposhian*, 958 F.3d at 978 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)); *see also Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1188 (10th Cir. 2003). "It is the movant's burden to establish that each of these factors tips in his or her favor." *Heideman*, 348 F.3d at 1188–89.

However, "courts 'disfavor' some preliminary injunctions and so require more of the parties who request them." *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 797 (10th Cir. 2019) (citing *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258–59 (10th Cir. 2005)). "Disfavored preliminary injunctions don't merely preserve the parties' relative positions pending trial." *Id.* "Instead, a disfavored injunction may exhibit any of

three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win." *Id.* "To get a disfavored injunction, the moving party faces a heavier burden on the likelihood-of-success-on-the-merits and the balance-of-harms factors"—the movant must make a "strong showing" that these factors tilt in his or her favor. *Id.*

### III.    ANALYSIS

Plaintiffs ask the Court to preliminarily enjoin Jeffco from assigning Student Plaintiffs to beds, bedrooms, and shower facilities with students of the opposite sex assigned at birth during any school-sponsored overnight trips; they do not ask the Court to order Jeffco to change its policy. *See* ECF No. 15 at 1; ECF No. 21 at 1. Before evaluating the merits of Plaintiffs' requested relief, the Court must satisfy itself that there a justiciable issue before it—that is to say, that there is an actual "case" or "controversy."

Article III of the United States Constitution gives federal courts the power to decide only "cases" or "controversies." U.S. Const. art. III, § 2. This constitutional limitation requires "a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions." *Carney v. Adams*, 592 U.S. 53, 58 (2020). "The doctrines of standing and mootness aim to ensure federal courts stay within Article III's bounds throughout the litigation." *Rio Grande Found. v. Oliver*, 57 F.4th 1147, 1159-60 (10th Cir. 2023). To establish Article III standing, a plaintiff must demonstrate "a concrete and particularized injury that is fairly traceable to the challenged conduct[ ] and is likely to be redressed by a favorable judicial decision." *Carney*, 592 U.S. at 58 (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013)). "The party invoking federal jurisdiction

bears the burden of establishing standing," so it is Plaintiffs' burden to establish standing here. *W. Watersheds Project v. Interior Bd. of Land Appeals*, 62 F.4th 1293, 1296 (10th Cir. 2023). At the preliminary injunction stage, Plaintiffs must make a "clear showing" that they are "likely" to establish each element of standing. *See Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 22 (2008) (emphasis deleted).

### A.    Standing for Prospective Relief

Plaintiffs do not seek relief for their asserted past injuries, nor do they ask Jeffco to change its policy; rather, they ask for prospective relief as it relates to specific Student Plaintiffs on upcoming school-sponsored overnight trips. "[B]ecause the plaintiffs request forward-looking relief, they must face 'a real and immediate threat of repeated injury.' " *Murthy v. Missouri,* 144 S. Ct. 1972, 1986, 219 L. Ed. 2d 604 (2024) (quoting *O'Shea*, 414 U.S. at 496); *see also PETA v. Rasmussen*, 298 F.3d 1198, 1202 (10th Cir. 2002) (standing for prospective relief requires a continuing injury). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (internal quotation marks omitted).

Accordingly, to establish standing for their requested prospective relief, Plaintiffs must show a substantial risk that "in the near future" Jeffco will require Student Plaintiffs to share a bed, bedroom, or shower facilities on a school-sponsored trip with a member of the opposite sex assigned at birth—specifically, a transgender student whose sex assigned at birth is the opposite of the Student Plaintiff's. *See Murthy*, 144 S. Ct. at 1986. Based upon the record before it, the Court concludes that Plaintiffs have not shown that

the alleged future injury is certainly impending or that there is a substantial risk that the harm will occur on any of the upcoming school-sponsored overnight trips.

### 1. Outdoor Lab

The Court first addresses Plaintiff P.P.'s upcoming trip to Outdoor Lab, which is scheduled for November 5-8, 2024. Plaintiffs allege P.P. will be harmed on the Outdoor Lab trip because he will be required to share a bed, bedroom, and shower facilities with students of the opposite sex assigned at birth on that trip. However, based on the record before it and Jeffco's specific representations as to measures that will be taken on this trip, this alleged harm is neither certain nor substantially likely.

Outdoor Lab is a four-day program at either Mount Blue Sky or Windy Peak campgrounds. *See* MA at 1. All sixth-grade students enrolled in Jeffco Public Schools are expected to attend Outdoor Lab with their homeschool peers and teachers. *Id.* Parents do not attend Outdoor Lab. The students are supervised by sixth grade teachers and visiting staff 24 hours a day, Outdoor Lab resident and daily staff. *Id.* at 39. The high school leaders and interns stay in the bunkhouses. *Id.* at 43. The students at Outdoor Lab stay in gender-segregated bunkhouses that sleep between 8 and 28 students and between 2 and 8 high school leaders/interns. *Id.* at 43; ECF No. 25-1, RA at 3-4 ¶¶ 14, 15, 18-22. The bunkhouses include single occupancy beds and only the assigned student is allowed to be on the bed. MA at 43; RA at 3-4 ¶¶ 21, 22. Many bunkhouses have private bathrooms and double-curtained showers to optimize privacy; otherwise, there are central bathrooms that provide the same privacy. MA at 43; RA at 4 ¶¶ 22, 25, 26. To ensure that

all students have time to shower, a high school leader stands behind another wall to time students' showers and to respond to any emergencies. RA at 4 ¶ 27.

An informational slideshow is shown to parents and guardians ahead of Outdoor Lab. MA at 9-58. The slideshow provides extensive information on Outdoor Lab and gives parents and guardians the opportunity to ask any questions about it. *Id.* at 42. The slideshow states that, "accommodations for most student needs can be met." *Id.* The FAQ for Outdoor Lab reiterates the availability of accommodations, providing that "any student, regardless of gender identity, who has a need or desire for increased privacy, should be provided with reasonable accommodation, if a safety concern arises." *Id.* at 64. Further, an overnight stay is not a requirement for participation in Outdoor Lab. Students may choose to attend as day students while still participating in all of Outdoor Lab's educational offerings. RA at 5 ¶¶ 36-38. In addition to the informational slideshow, the FAQ page for Outdoor Lab addresses several relevant topics:

> Q: Does Outdoor Lab have knowledge if a student is transgender, gender expansive, or gender non-conforming? Why is there a boy with my daughter at Outdoor Lab or overnight trip (or vice versa)?
>
> A: Not usually. Students are not required to tell our program if they identify as transgender. Outdoor Lab will only know if a student is transgender or gender non-conforming if the student or student's caregiver provides that information, which is kept confidential.
>
> In accordance with Colorado law and District Policy JB-R, in most cases, students who are transgender should be assigned to share overnight accommodations with other students that share the student's gender identity consistently asserted at school. For example, a transgender student who identifies as male would be provided accommodations with other male students.
>
> . . .

Q: Is it possible for my student to arrange alternative accommodations if they or I have concerns with overnight lodging for my student?

A: Cabins are considered semi-private spaces that are safe and appropriate for the students and staff who reside there. Interns and high school leaders are trained to alert staff to any situations where students are not meeting behavioral or safety expectations.

Any student, regardless of gender identity, who has a need or desire for increased privacy, should be provided with reasonable accommodation, if a safety concern arises. [3]

MA at 64.

Plaintiffs allege P.P. will be injured without the requested relief because Jeffco's policy "require[s] students to share beds, bedrooms, and shower facilities with students of the opposite sex on school-sponsored overnight trips." ECF No. 15 at 1. But that is a mischaracterization of the policy. Jeffco's policy does not require students of the opposite sex to share accommodations; rather, the policy offers accommodations for transgender students to ensure Jeffco's compliance with "Colorado law and District policy, [which] require[s] that all programs, activities, and employment practices are free from discrimination based on sex, sexual orientation, and gender identity and expression." MA at 94. In line with these requirements, Jeffco's policy provides that "[i]in most cases, students who are transgender should be assigned to overnight accommodations with other students that share the student's gender identity consistently asserted at school." *Id.* at 96. The policy further provides that any accommodations "should be provided in a

---

[3] Although Plaintiffs allege this language has been removed from Jeffco's policy regarding transgender students, the language remains on the Outdoor Lab FAQ stating that: "[a]ny student, regardless of gender identity, who has a need or desire for increased privacy, should be provided with reasonable accommodation, if a safety concern arises." *See* Jeffco Outdoor Lab FAQ, https://outdoorlab.jeffcopublicschools.org/about/faq (last visited November 1, 2024).

way that allows the student's transgender status to be kept confidential." *Id*. at 96. As explained above, Jeffco does not necessarily know the sex assigned at birth of each student. To determine a student's sex assigned at birth with absolute certainty ahead of every scheduled overnight trip would require a wholesale change to Jeffco's current policy and, according to Jeffco, would cause it to violate state and federal law, including the Colorado Anti-Discrimination Act and Title IX, which prohibit discrimination based on gender identity, and the Family Educational Rights and Privacy Act, which protects students' gender identity information.

Plaintiffs do not ask Jeffco to alter this policy or to exclude transgender students from Outdoor Lab, but they request that P.P. not be assigned to a bed, bedroom, or shower facilities with students of the opposite sex at Outdoor Lab. Jeffco has committed to not knowingly making such assignments, but as explained above, Jeffco does not necessarily know the sex assigned at birth of each student. *See* ECF No. 32, Movant's Supplemental App'x ("MSA") at 14 ("[Jeffco will not knowingly assign[ing] students of different birth sexes to share a bed . . . ."). Thus, to address Plaintiffs' concerns, Jeffco has offered Plaintiffs several options to avoid any chance that P.P. will share overnight accommodations with a student of the opposite sex assigned at birth. These options include attending Outdoor Lab as a day student while still fully participating in all of Outdoor Lab's educational offerings, or consulting directly with the Outdoor Lab trip leader to arrange some other kind of accommodation. *See* 29-1 at 23 (Jeffco's letter to Plaintiffs' counsel stating that "[f]amilies who have a need for some other kind of accommodation for student travel are invited to consult directly with their trip leader . . . ."). If Plaintiffs avail

themselves of these options, P.P. will not be required to share a bed, bedroom, or shower facility with any student of the opposite sex assigned at birth at Outdoor Lab.

Plaintiffs argue that, despite the accommodations Jeffco now purports to offer, these options were either not previously available or proved inadequate in the past. Yet in their response to Jeffco's request for expedited discovery related to the preliminary injunction motion, Plaintiffs argued that discovery regarding Jeffco's past conduct was unnecessary because "the question at the heart of the preliminary injunction motion is whether Jeffco is willing to provide Plaintiffs an accommodation from its policy *now*." ECF No. 21 at 5 (emphasis in original). The Court relied on this representation in denying Jeffco's request for expedited discovery. *See* ECF No. 22 at 4-5. Plaintiffs cannot have it both ways—they cannot claim that the only issue is whether Plaintiffs will provide accommodations going forward, and then, when Jeffco proposes accommodations going forward, dismiss those offers to focus on past occurrences.

And in any case, the alleged past incident at Outdoor Lab does not suggest that Plaintiffs would be denied accommodations going forward. The past incident occurred when B.R. attended Outdoor Lab from December 13-16, 2022. ECF No. 1 ¶¶ 144, 158. On that trip, B.R. discovered that one of his high school leaders was an 18-year-old biological female who identifies as "non-binary." *Id.* ¶¶ 162-167. B.R. was uncomfortable showering because the high school leader would be standing outside the showers to time each boy's shower as instructed by Jeffco. *Id.* ¶¶ 170-72. Although the showers were private and were fashioned with privacy curtains, B.R. was concerned that the high school counselor could see in through the gaps in the sides. MA at 81, ¶ 15. Due to this concern,

B.R. and some of the other boys decided not to shower. *Id.* ¶ 18. When his mother picked B.R. up after Outdoor Lab, he immediately told her about his counselor and how he felt uncomfortable having a female counselor sleep in his room and monitor his showers. ECF No. 1 ¶¶ 160, 174.

Although the Court sympathizes with B.R.'s experience at Outdoor Lab, this incident is not predictive of what P.P.'s experience at Outdoor Lab will be because there is no allegation that Plaintiffs requested accommodations prior to B.R. attending Outdoor Lab in 2022. *See Murthy*, 144 S. Ct. at 1987 (where plaintiffs seek "only forward-looking relief, the past injuries are relevant only for their predictive value."). Now that Plaintiffs are aware of the options, they can communicate with Jeffco to arrange accommodations ahead of the trip. Plaintiffs claim that they have requested accommodations and those requests have been denied. However, the communications cited by Plaintiffs reveal only that Jeffco declined Plaintiffs' request to share students' private gender identity with other families prior to trips and would not agree to change its policy. But Jeffco represented to Plaintiffs that they would not "knowingly assign students of different birth sexes to share a bed" and that "[f]amilies who have a need for some other kind of accommodation for student travel are invited to consult directly with their trip leader . . . ." MSA at 14, 23. There is no evidence that Plaintiffs have tried to avail themselves of the accommodations Jeffco offers for Outdoor Lab. If P.P. seeks accommodations ahead of Outdoor Lab, then the Court accepts Jeffco's representations that accommodations are available and expects Jeffco to follow through on those representations. *See* ECF No. 25 at 10. But Plaintiffs "cannot manufacture standing" by refusing to seek the available accommodation

and then claim harm "based on their fears of hypothetical future harm that is not certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 416 (2013).

In sum, if Plaintiffs wish to eliminate any chance that P.P. will share accommodations with a student of the opposite sex assigned at birth at Outdoor Lab, then P.P. and P.P.'s parents can communicate with Jeffco to avail themselves of the alternative accommodations available for P.P.—for example, P.P. can attend as a day student while fully participating in all educational programming or engage in an alternative curriculum at home or at school. *See* RA at 5-6. P.P.'s parents assert these options would be inconvenient for them, but do not dispute that utilizing these options would eliminate the alleged harm.

Based upon this record, the Court concludes that Plaintiffs have not shown a threatened future injury is certainly impending or that there is a substantial risk that the harm will occur on the November 5-8 Outdoor Lab trip.

### 2.    2025 Washington D.C./Philadelphia Trip

Next, G.W. and B.W. are registered to attend and their parents are currently making payments for their June 2025 trip to Washington D.C/Philadelphia. MA at 68 ¶ 24. Plaintiffs allege G.W. and B.W. will be harmed on this trip because they will be required to share a bed, bedroom, or shower facilities with students of the opposite sex. For similar reasons as stated above, the Court does not find that this alleged future harm is certain or substantially likely.

The Washington D.C./Philadelphia trip is offered to all Jeffco fifth graders on an annual basis. RA at 61-62 ¶¶ 4, 6. The trip is optional, and Jeffco partners with EF

Educational Tours, a leading private educational tour company, to offer it to students. *Id.* at 61 ¶ 4. The trip is not part of any core curriculum but is an opportunity for students to travel and focuses on leadership, advocacy, and communication through the lens of some of America's historical leaders. *Id.* ¶ 6. EF books the accommodations for the trip. *Id.* ¶ 5. EF's General Terms and Conditions, which parents and guardians of traveling students receive and sign, explain that a student may request a double-occupancy room, identify other rooming arrangements available (e.g., triple-occupancy for a student and their family), and provide contact information for "other rooming options, as well as details and pricing." MA at 65 ¶ 28, 69.

As with Outdoor Lab, Jeffco offers accommodations that can eliminate the possibility that G.W. and B.W. will be assigned to share a room or bed with students of the opposite sex assigned at birth. Jeffco has confirmed that it will not knowingly assign Student Plaintiffs to beds with students of the opposite sex assigned at birth. But, as explained above, Jeffco does not always know each student's sex assigned at birth. Accordingly, Jeffco offers other rooming options that would ensure G.W. and B.W. are not roomed with a student of the opposite sex assigned at birth. For example, parents may request accommodations including single or double rooms or request to stay in the same room as their child. RA at 64 ¶ 25; 65 ¶¶ 26-27. And EF's General Terms and Conditions explicitly provide that a student may request a double-occupancy room, room with their family, or contact EF to discuss other rooming options. RA at 65 ¶ 28, 69. Thus, Plaintiffs may avail themselves of these options to ensure that G.W. and B.W. are not roomed with a student of the opposite sex assigned at birth.

Again, Plaintiffs attempt to discredit Jeffco's offer of available accommodations by focusing on a past incident that occurred on the 2023 Washington D.C./Philadelphia trip. On that trip, D.W. was not assigned her requested roommates; instead, she was assigned to room with two students from her school and a third student that she did not know. ECF No. 1 ¶¶ 64-67. The four students were assigned to a room with two queen beds. *Id.* ¶ 68. On the first evening of the trip, the roommate that D.W. did not previously know shared that they were born a boy but identify as a transgender girl. *Id.* ¶ 85. D.W. felt uncomfortable sharing a bed with a biological male and called her mother, who was on the trip. *Id.* ¶¶ 87-92. After her mother spoke with a Jeffco teacher and D.W.'s principal, the transgender student and another female student were moved to another room under the pretense that D.W. had a sick roommate who needed more space. *Id.* ¶¶ 111-117. Until this incident, D.W.'s principal was not aware that the transgender student was a transgender girl. RA at 63 ¶¶ 15-17.

To the extent this past incident has any predictive value, it shows that Jeffco does not always know a student's sex assigned at birth ahead of each trip but will make accommodations upon request. Indeed, as soon as D.W.'s concern was raised on the first day of the trip, accommodations were promptly made—at no point during the trip was D.W. required to share a bed, room, or shower facility with a student of the opposite sex assigned at birth. Now that Plaintiffs are aware of Jeffco's policy, they are free to avail themselves of the multiple rooming options available to them that would ensure G.W. and B.W. are not assigned to room with a student of the opposite sex assigned at birth. Again,

the Court accepts Jeffco's representations that accommodations are available and expects Jeffco to follow through on those representations. *See* ECF No. 25 at 10.

Based upon this record, the Court concludes that Plaintiffs have not shown a threatened future injury is certainly impending or that there is a substantial risk that the harm will occur on the 2025 Washington D.C./Philadelphia trip.

### 3.    Other Athletic and Extracurricular Trips

Finally, Plaintiffs allege that M.P. is a member of the varsity basketball team who will be required to participate in overnight stays. ECF 15 at 15. However, Plaintiffs now concede the varsity basketball team has not yet been selected and there are no allegations of any scheduled overnight trips. RA at 60 ¶ 3; MSA at 32-33 ¶¶ 2-8. Plaintiffs also allege that D.R. is a member of the soccer team and participates in HOSA[4], both of which require overnight travel. MA at 78 ¶ 14. But Plaintiffs concede that soccer does not typically start until January. *Id.* Plaintiffs have not alleged any scheduled overnight trips for either soccer or HOSA.

Given the uncertainty as to whether any Plaintiffs will make these teams or join these clubs and whether/when they will travel for these extracurricular activities, the Court does not find that the alleged injury is anything more than a mere possibility. Accordingly, Plaintiffs have not sufficiently alleged an injury in fact. *See Tandy v. City of Wichita*, 380

---

[4] Although not explained by Plaintiffs, HOSA is "a global student-led organization recognized by the U.S. Department of Education and the Department of Health and Human Services and several federal and state agencies. . . . HOSA, or Future Health Professionals, aims to empower its members to lead within the global health community through education, collaboration, and hands-on experience. Central to HOSA's mission is fostering leadership and technical skills among health science students, integrating motivation, awareness, and recognition into their educational journey." *See* HOSA, https://www.coloradohosa.org/what-is-hosa (last visited November 1, 2024). There is no indication that overnight travel is required to participate in HOSA.

F.3d 1277, 1283 (10th Cir. 2004) (to establish injury in fact, the "the threatened injury must be 'certainly impending' and not merely speculative").

For these reasons, the Court concludes that Plaintiffs have not shown they face "a real and immediate threat of repeated injury." *O'Shea*, 414 U.S. at 496. Accordingly, Plaintiffs have not alleged an injury in fact to justify the extraordinary relief of preliminary injunction. Thus, the Court denies the Motion for lack of standing.

## IV.    CONCLUSION

For the reasons stated herein, Plaintiffs' Motion for Preliminary Injunction, ECF No. 15, is DENIED.

DATED: November 1, 2024

BY THE COURT:

_____
REGINA M. RODRIGUEZ
United States District Judge